IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

LINDA G. ADAMS, Independent    )
Administrator of the Estate of    )
JAMES E. ADAMS, deceased,    )
    )
     Plaintiff,    )
    )
vs.    )    Case No.:  07-CV-497-GPM-DGW
    )
JOHNSON & JOHNSON,  et al.    )
    )
     Defendants.    )

## PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

**I.**     **Introduction**

On April 28, 2005, Linda Adams removed a 75 mcg/hr duragesic patch designed and manufactured by the defendants from an airtight sealed pouch, removed its adhesive backing and placed it on the back of her husband, James E. Adams.  The patch was designed to provide a safe therapeutic (1.7 ng/ml) fentanyl blood level over a 72 hour period.  Mr. Adams then went to bed. The next morning, Mr. Adams was dead.  An autopsy found he had a toxic fentanyl blood level **seven** times greater than expected with a proper functioning patch. (12.2 ng/ml).  Defendants seek summary judgment arguing that "this is a case in search of a defect --- but there is none." Defendants lose their self-described "game" of hide and seek because their defective patch found Mr. Adams and provided him with a toxic and death causing level of fentanyl.

**II.**     **Factual Background**

On January 21, 2005, James Adams, a married 48 year old father of three, injured his back at work when he was pushed by a cow into a fence.  (Ex 2, pp. 17, 25, 40)[1].  Prior to the

---

[1] Exhibits 1- 16 are attached to Defendants' motion.  Exhibits 17-32 are attached to plaintiff's response.

accident, Mr. Adams had been healthy and strong, only having had a tooth pulled and an

appendectomy in 1975.  (Ex. 2, pp. 29-33).  Although his injuries were not life threatening, Mr.

Adams had a herniated disc at L4-5, arthritic changes, a posterior annular tear at L5-S1, and a

C5-6 tear by Dr. John Grimm.  (Ex. 5, pp. 12-13).  Mr. Adams' back pain had been so severe that

he could only sleep two hours per night, and was doing so in a chair until the night before his

death.  (Ex. 5, 14, Ex. 2, pp. 62-63;66).  To treat his pain, Dr. Grimm eventually prescribed a

Duragesic ® 75 mcg/hr fentanyl patch on Monday, April 25, 2005, and ordered an epidural

steroid injection for Wednesday, April 27, 2005. (Ex. 5 p.16,19-20).

    The Duragesic ® 75 mcg/hr fentanyl patch is a transdermal system designed and

manufactured to provide fentanyl, an opiod analgesic, or pain killer, at a controlled rate over a 72

hour period.  (Ex. 17, RTA #2).  The fentanyl is contained in a reservoir between two layers of

film, with one of the layers known as a release or rate controlled membrane that is supposed to

govern how much fentanyl passes into the patient.  (Ex. 14, p. 13).  An example appears below:



As designed, and according to the product insert, the average fentanyl concentration in the blood

following the first 72 hour application is 1.7 ng/ml with a standard deviation of 0.7 ng/ml. (Ex.

17, RTA #10).  Fentanyl is 1000 times more potent than morphine, and if more fentanyl is

provided than intended, it can cause death.  (Ex. 10, p. 48).  Further, fentanyl has a very narrow

therapeutic index, meaning the difference between a therapeutic dose of fentanyl and a fatal dose

of fentanyl is very small.  (Ex. 10, p. 49).  For example, fentanyl can be toxic when in excess of

3 ng/ml in the bloodstream, but the therapeutic dose of a 75 mcg/hr patch is 1.7 ng/ml.  (Ex. 8, p. 11; Ex. 10, p. 54; Ex. 11, p. 1).  Too much fentanyl can lead to slowed breathing or hypoventilation, and eventually death.  (Ex. 11, p. 1, 3).  Hypoventilation or respiratory suppression indirectly will ultimately cause cardiac arrhythmia[2].  (Ex. 24, Leikin p. 23).  Also, if the Duragesic® system is damaged, controlled drug delivery is not possible. (Ex. 11, p. 4).

James and Linda took the prescription for the fentanyl to the CVS Pharmacy in Lawrenceville, Illinois.  (Ex. 6, Ex. 2, p. 57).  They were provided with a carton containing five 75 mcg/hr fentanyl patches, each individually sealed in an airtight pouch manufactured by Alza Corporation and distributed by Janssen, L.P.  (Ex. 2, p. 56-57; Ex. 17, RTA #5; Ex. 14, p.35-37).  None of the defendants have any record of what the lot number was of the fentanyl patches sold to Mr. Adams.  (Ex. 18, p. 3).  Mrs. Adams then removed one of the patches from the pouch, peeled off the protective liner, and applied the patch to her husband's lower back.  (Ex. 2, p. 57).

On Wednesday, April 27, 2005, Mr. Adams went to the pain clinic for his epidural injection.  (Ex. 4).  Prior to and during his epidural steroid injection, an ECG or electrocardiogram was performed and demonstrated NSR or normal sinus rhythm.  (Ex. 19, pp. 2, 6).   The pain clinic documented the Duragesic patch on Mr. Adams' back. (Ex. 19, pp. 5-6).

On Thursday, April 28, 2005, Linda Adams, removed the first patch from her husband's lower back.  (Ex. 2, pp. 63-64).  She then removed a second patch from a sealed container and placed it on her husband's left shoulder blade area.  (Ex. 2, pp. 63-64).  That night, unlike prior nights, Mr. Adams actually slept in his bed.  (Ex. 2, 65-66; 70).  The next morning, Mrs. Adams was unable to arouse Mr. Adams who mumbled something to her.  (Ex. 2, p. 66).  Later, when she returned to the bedroom Mr. Adams was unresponsive and blue.  (Ex. 2, p. 66).  She called

---

[2] Everyone eventually dies of cardiac arrhythmia.  (Ex. 21, p. 36-37).  The ultimate question is what caused it.

911 and an ambulance was dispatched.  (Ex. 2, p. 66).  The carton containing the three remaining fentanyl patches was given to the emergency medical providers and destroyed.  (Ex. 2, p. 68-69).

Mr. Adams was pronounced dead at 11:28 a.m. at Lawrenceville Community Hospital. (Ex. 20, Death Certificate).  His body was refrigerated until autopsy by Dr. James M. Jacobi at 4:45 p.m.  (Ex. 8, p. 1; Ex. 9, 28).  After removing Mr. Adams' clothes, Dr. Jacobi noted the Duragesic 75 mcg/hr patch on Mr. Adams' left scapula. (Ex. 9, p. 22; Ex. 8, p. 9).  Dr. Jacobi then removed the patch and threw it away. (Ex, 9, p. 22).

Dr. Jacobi then removed loose blood from the neck line area and sent it for a toxicology examination at AIT laboratories.  (Ex. 9, p. 12; 9).  Dr. Jacobi took the blood from the neck area, and not the heart to avoid the changing toxicological findings and postmortem redistribution. (Ex. 9, 12-14; 27-28).  Dr. Jacobi found that Mr. Adams had a heart of normal size and weight, but Mr. Adams did have 70% occlusion of the circumflex coronary artery, but his other coronary arteries were normal.  (Ex. 9, 48, 56; Ex. 8, p.3, 6-7).  Dr. Jacobi did not find any evidence that was indicative that Mr. Adams had any heart damage.  (Ex. 9, p.48, 56).  Dr. Jacobi also noted that Mr. Adams had a condition known as a "fatty liver." (Ex. 8, p.7; Ex. 9, 17).

Later, Dr. Jacobi received the toxicology report from A.I.T. Laboratories.  It revealed that all but one of Mr. Adams' regular medications were at a therapeutic or anticipated level.  (Ex. 8, p. 5).  However, the toxicology report did reveal that Mr. Adams had a fentanyl blood level of 12.2 ng/ml instead of the expected blood level of 1.1-2.6 ng/ml from a 75 ug/h patch.  (Ex. 8, p. 5;11).    Dr. Jacobi also noted that reported blood levels involving four adult fatalities with fentanyl patches ranged from 12-41 ng/ML, and that reported fentanyl blood levels from deaths of seven individuals with intravenous use of fentanyl ranged from 3-28 ng/ML. (Ex. 8, p. 5).

Based upon these numbers, Dr. Jacobi stated that the 12.2 fentanyl level in Mr. Adams was in the toxic range, but below the average of 23 ng/ml in the four reported patch fatalities between 12 – 41 ng/ml. (Ex. 8, p.5). As a result, his official autopsy report concluded that the "toxic fentanyl level appears to represent a contributory factor to the cause of death." (Ex. 8, p. 5). However, Dr. Jacobi also reported that Mr. Adams 70% occlusion of his circumflex artery caused Mr. Adams to suffer cardiac arrhythmia. (Ex. 8, p. 1).

**III.    The Evidence**

  <u>a)</u>     **Dr. John Grimm**

Dr. Grimm testified he prescribed a box of five 75 mcg/hr patches to Mr. Adams on Monday, April 25, 2005. (Ex. 5, p. 20). Mr. Adams was to wear each patch for 3 days or 72 hours, take it off and apply a new one. (Ex. 5, p. 21). The purpose of each patch was to provide Mr. Adams 72 hours of consistent pain relief. (Ex. 5, p. 21, 23). Mr. Adams application of the first patch on Monday, and the second patch on Thursday would have been consistent with his instructions. (Ex. 5, p. 25).

Dr. Grimm expected that the patch would provide a therapeutic fentanyl blood level, and he understood that this would be in a range of 1.0 to 2.4 ng/ml with an average of 1.7 ng/ml. (Ex. 5, p. 29-30; 47-48). Subsequent to Mr. Adams' death, he found out that Mr. Adams' fentanyl blood level was way out of the therapeutic range. (Ex. 5, p. 30). Moreover, assuming the toxicology report showed that Mr. Adams had a fentanyl blood level of 12.2, and Mr. Adams wore the patch as prescribed, it was his opinion to a reasonable degree of medical certainty the Duragesic patch he prescribed failed to meet his expectations as a physician. (Ex. 5, p. 31). This was because this fentanyl blood "concentration was way out of line with what has been reported as therapeutic, what we are to expect with that dose of Duragesic." (Ex. 5, p. 31). Finally, absent

evidence that Mr. Adams abused or misused the patch, he testified it was more probably true than not something was wrong with the patch sold to Mr. Adams.  (Ex. 5, p. 31-32).

    **b)**    **Dr. James M. Jacobi**

Dr. Jacobi testified that when he wrote his autopsy report, it contained his opinions to a reasonable degree of pathological certainty.  (Ex. 9, p. 31).  This included the opinion that "the toxic blood Fentanyl  level from the skin patch appears to represent a contributing factor" in Mr. Adams' death.  (Ex. 8, p. 1).  However, after he wrote the report, he went to a conference in Indiana where he heard that there are some people who are experienced users of fentanyl that can develop a tolerance of higher fentanyl levels in their blood that may not be lethal.  (Ex. 9, p. 31-32).  For this reason, he backtracked a little bit about the fentanyl opinion, "knowing that Mr. Adams was a chronic user, he would back off on the fentanyl being toxic."  (Ex. 9, p. 19, 29) (Emphasis added).  He further stated he was not an expert in toxicology. (Ex. 9, p. 11). Moreover, he also found that Mr. Adams had a very fatty liver[3], but he was not sure if that played any role in Mr. Adams death or not.  (Ex.9, p. 17-18, 29).  For this reason, at his deposition, he attributed the primary cause of death as the 70% occlusion of the circumflex coronary artery causing cardiac arrhythmia and death. (Ex. 9, p.16, 28).

On cross-examination, Dr. Jacobi admitted he did not know how long that Mr. Adams had been taking the fentanyl.  (Ex. 9, p. 32).  He also admitted that he only reviewed the hospital records from the day of Mr. Adams' death. (Ex. 9, 41).  He further admitted that if Mr. Adams was only on his second patch, Mr. Adams would not be a chronic user, and he did not have any expertise on how long it would take for Mr. Adams to develop a tolerance. (Ex. 9, 33-35).  Dr.

---

Q.    And in this case as far as the fatty liver or the steatosis actually being the cause of death, you don't have any evidence that actually caused the death in this case.

A.    No. (Ex. 9, p. 40).

Jacobi also stated that if Mr. Adams was not tolerant to fentanyl, the fentanyl could have played a role in his death, and the expected fentanyl blood level for Mr. Adams after 72 hours is 1.7 with a standard deviation of 0.7.  (Ex. 9, 36-37).  He also reported the references he looked at reported deaths with transdermal fentanyl patches with a blood level of 12 ng/ml, but the average was 23 or 28. (Ex. 9, p. 51, 35).   As a result, when ascribing a cause of death, he did not want to say it was simply the toxic fentanyl level because he "always like[s] to use the average. . ." (Ex. 9, p. 32, 62).  Ultimately, Dr. Jacobi stated whether a fentanyl level of 12.2 in a 48 year old man is fatal is something he would defer to a toxicologist. (Ex. 9, 62).

Concerning his opinion the 70% occlusion of the circumflex artery caused Mr. Adams' death, Dr. Jacobi admitted this was simply based upon his <u>assumption</u> that the occlusion caused an arrhythmia and Mr. Adams was found dead in bed by his wife.  (Ex. 9, p. 48-50).

> Q.    So the fact that he is found at home by his wife, and you find 70%  occlusion is what leads you to the opinion that he had cardiac arrhythmia secondary to the 70% occlusion which causes his death; is that correct, is that a fair statement?
> A.    That's a fair statement, and there's no better explanation, I mean.

(Ex. 9, 49-50).   An arrhythmia will occur when for some reason the heart does not get the amount of blood it needs, goes into failed rhythm, and if the heart stops beating, a person will not make it.  (Ex. 9, 17).  Dr. Jacobi he further admitted there are people walking around with 70 to 98% occlusion without having problems.  (Ex. 9, 44-45).  In addition, he noted that Mr. Adams' heart weight was normal, (Ex. 9, p. 48), there was no evidence of heart muscle damage, and there was no evidence of any plaque or thrombi that had broken off the lumen of any of the coronary arteries. (Ex. 9, p. 56).  He also noted the other coronary arteries only had trace plaque, and the electrical conducting system in Mr. Adams heart was normal and there was anatomical evidence of cardiac arrhythmia.  (Ex. 9, p. 56, 59, 17).  He also stated that he was not aware that Mr. Adams had a normal ECG on the Wednesday before his death. (Ex. 9, p.53).  Finally he

agreed that if someone received too great of dose of fentanyl this could also be a reason for finding someone unresponsive or dead in bed. (Ex. 9, p. 61-62).

    <u>c)</u>    **<u>Dr. Michael Evans</u>**

Dr. Michael Evans is a Ph.D. toxicologist at A.I.T. Laboratories. (Ex. 10, p. 5-6). A.I.T. tested Mr. Adams blood samples sent to them by Dr. Jacobi. (Ex. 10, p 18). According to the literature, a 75 mcg patch should produce a fentanyl blood level of 1.7 ng/ml. (Ex. 10, p. 50). He further noted that if more fentanyl is provided than intended it can cause death, (Ex. 10, 48) and a fentanyl blood level of 3 ng/ml can be potentially toxic. (Ex. 10, p. 54; Ex. 8, p. 11). In this case, his lab determined that Mr. Adams' fentanyl blood level was 12.2 ng/ml. (Ex. 10, p. 48, Ex. 8, p.11). Moreover, while Dr. Evans noted that with post-mortem redistribution, the heart blood can increase the concentration of the fentanyl found in the blood due to he release of the drug back into the blood from the tissues after death, (Ex. 10, p. 42-43), in Mr. Adams's case, if the blood sample was taken from the loose blood in Mr. Adams' neck area, he did not think the blood would undergo post-mortem redistribution. (Ex. 10, p. 44-45).

    <u>d)</u>    **<u>Dr. Michael Kaufman</u>**

Dr. Michael Kaufman, a professor of pathology at Northwestern University, the director of autopsy services, as well as the senior attending pathologist at Evanston Hospital reviewed this matter on behalf of the plaintiff. (Ex. 21, p. 1; Ex. 22 p. 1). After reviewing the medical records of Mr. Adams, the pathological slides from the autopsy, and the depositions of Linda Adams, Dr. Grimm, and Dr. Jacobi, Dr. Kaufman determined that James Adams died from a toxic dose of fentanyl. (Ex. 23 p. 3). He also determined that Mr. Adams death "was not due to any cardiac ischemia leading to an arrhythmia from focal coronary artery disease, nor [that] Mr. Adams moderate steatosis [fatty liver] was a cause or contributing factor to his death." (Ex. 23,

p. 3). He further noted that assuming the patch was used as described by Mrs. Adams, and was not abused, the expected Fentanyl level for the patch was 1.7 +/- 0.7 ng/ml and this was clearly exceeded by the post-mortem toxicology values obtained by Dr. Jacobi. (Ex. 23, p. 3). He also noted that because the blood was drawn from the superior vena cava as opposed to inferior vena cava or right side of the heart, the possible contribution of postmortem redistribution to explain the fentanyl levels was eliminated. (Ex. 23, p. 3). He also testified to a reasonable degree of medical certainty that the delivery system patch in the patch used by Mr. Adams "delivered drug at a rate that was higher than it should have, through either some manufacturing defect or product design defect." (Ex. 21, p. 50).[4]  In some fashion, "the product was defective in that it delivered a level of drug in an amount more than it should have, such that the circulating blood level and its physiologic effect became toxic, and ultimately fatal." (Ex. 21, p. 55).

### e)        Dr. Jerrold B. Leikin

Dr. Jerrold Leikin, the Director of Medical Toxicology at Evanston Northwestern Healthcare, also reviewed this case. (Ex. 24, p. 3; Ex. 25). He noted that the expectant fentanyl level from a 75 ug/h Duragesic patch was 1.7 ng/ml with a standard deviation of +/- 0.7, and that the post-mortem blood level should not exceed 4 ng/ml in a proper functioning patch. (Ex. 26). He further noted that Mr. Adams was found to have a post-mortem fentanyl level of 12.2 ng/ml, and this level is consistent with a toxic level that can be expected to result in deleterious sedative effects, (central nervous system and respiratory depression) that can be lethal. (Ex. 26). He also

---

[4] We have somebody who died, and you have to decide . . . why did he die and why did he die 96 hours after he starts this medication. Why does he die the day after the second patch is put on, when other things are all steady state? All of the other multiple drugs he was on in therapeutic levels were done in a steady state. The heart disease, in my mind, was a steady state, certainly over several months it was going on and, certainly during the several months since his accident with getting hit by the cow, all of these things were steady state. So the only new thing that happened to this guy was that he started the on the fentanyl patch. And literally, the day after he gets the second patch put on, he is found dead, and with a level that, clearly, was multiples higher than anything that the product manufacturer would have determined to be the appropriate drug level. And so me, as pathologist, says,

noted that this level "would not be expected to occur from a 75 ug/h Duragesic patch" and he did not believe post-mortem redistribution played any significant role in the clinical interpretation of the fentanyl levels.  (Ex. 26).  Finally, he concluded that the fentanyl was a significant contributing factor in Mr. Adams' death. (Ex. 26).

   f)     **David Chullino--- Alza Corporation**

      David Chullino, Alza Corporation's person most knowledgeable of the manufacturing process, testified that patches have a two year shelf life.  (Ex. 14, p. 86-87).  In a typical lot or batch of patches, 165,000 patches would be made, with 240 patches being made per minute, or 14,400 patches per hour.  (Ex. 14, 37, 45).  Thereafter, in a normal lot, Alza would remove 1,250 patches and look for defects.  (Ex. 14, 46).  If critical defects were thereafter found in .01 percent of those patches, the lot would be failed.  (Ex. 14, p. 47).  Despite these quality control procedures, Mr. Chullino stated that there was a possibility that patches with defects would make it through and be received by customers.  (Ex. 14, p. 50, 57, 58).  Against this backdrop, Mr. Chullino stated that in February, 2004, a recall was necessitated after it was found that patches with critical defects, had made it through its inspection and quality control system and made it to customers.  (Ex. 14, p. 50; Ex. 12.  The recall was expanded in April, 2004.  (Ex. 13).  Defects in patches identified in the subsequent FDA investigation revealed patches with:

- Fold over in the backing system
- Gel in seal
- Corners of system cut off
- Holes in drug reservoir
- Slit in pouches and system

 (Ex. 27, p. 11-12).  According to the recall, defective patches may leak and "exposure to leaked medication could result in . . . increased transdermal absorption of the opiate component

---

"What given all these factors, what is the most likely event here?" And, to me, this is the most likely event." (Ex 21,

fentanyl, leading to potentially life threatening complications. (Ex. 13 p.1). Further, the evidence indicated that Alza was aware of some of these defects as early as 2001. (Ex. 14, p. 80-81; 83). Subsequent to the recall, Alza implemented some procedures to decrease the chances that defective patches might make it through their quality control will make it through to patients. (Ex. 14, p. 72-73). Moreover, one of the new quality control procedures included a vision system that would help detect defective patches that was installed in 2001, but it was not put into operation and validated until August 2004. (Ex. 14, p 65-66). Finally, because Mr. Chullino did not know how many Duragesic fentanyl patches were sold or used in Lawrenceville, Illinois, he could not tell when the patch sold to Mr. Adams was manufactured. (Ex. 14, p. 86-88).

### g) Alternative Feasible Design

Mr. Chullino noted his companies have sold and manufactured fentanyl patches in Europe since 2004 based upon a matrix technology, as opposed to a reservoir technology. (Ex. 14, p. 12-16). According to Mr. Chullino, one advantage of the matrix technology patches that are sold in Europe is that the gel inside the patches cannot leak. (Ex. 14, p. 16; Ex. 28 p. 2; Ex. 30, p. 35-40;57) (noting matrix and reservoir patches are bioequivalent) (Ex. 32, p. 74, 190) (noting today there are commercially available matrix fentanyl patches).

## III.   Legal Argument

### a)   Summary Judgment Standard

Summary judgment is a drastic remedy and is only proper when the pleadings and affidavits, if any, "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law ." Fed.R.Civ.P.56(c); <u>Celotex Corp. v. Catrett,</u>

---

p. 52-53).

477 U.S. 317, 322 (1986).  The burden is on the moving party and the Court must consider the

entire record, and draw all reasonable inferences and resolve all factual disputes in favor of the

non-movant. Schneiker v. Fortis Insurance Co. 200 F.3d 1055, 1057 (7th Cir.2000);  Polson v.

Cottrell, Inc., 2007 WL 518652 (S.D. Ill. 2007).  Also, in a product liability action, a plaintiff

may rely on direct or circumstantial evidence or on expert testimony in proving her case.

Millette v. Radosta, 404 N.E.2d 823, 835 (Ill. App. 1st Dist. 1980).  When the entire record is

considered, and all reasonable inferences and all factual disputes are resolved in favor of the

Estate of James Adams, defendants' motion must be denied.

> **b)    Questions of Fact Exist on Plaintiff's Consumer Expectation Product Defect Claim**

Under Illinois law, a plaintiff may prove a product defect under the "consumer

expectation test" or the "risk utility" test.  Mikolajczyk v. Ford Motor Co.,  2008 WL 660365

(Ill. 200*).  To prove a case under the consumer expectation test, the plaintiff must produce

"evidence that the product failed to perform as safely as an ordinary consumer would expect

when used in an intended or reasonably foreseeable manner."  Id.

Illinois allows a plaintiff to submit a product liability claim to a jury under the consumer

expectation test based upon the "inference of defect" doctrine.  As a result, in a product's case, it

is not necessary for the plaintiff to pinpoint the specific defect in a product.  Instead, a *prima*

*facie* case "that a product was defective and the defect existed when it left the manufacturer's

control is made by proof that in the absence of abnormal use or reasonable secondary causes the

product failed to perform in the manner reasonably expected in light of its nature and intended

function."  Tweedy v. Wright Ford Sales, Inc., 357 N.E.2d 449 (Ill. 1976); Doyle v. White Metal

Rolling and Stamping Corp., 618 N.E.2d 909, 916 (Ill. App. 1st Dist. 1993); Varady v. Guardian

Co., 506 N.E.2d 708, 712 (Ill. App. 5th Dist. 1987).  Plaintiffs may use this theory against

manufactures of medical products.  Weedon v. Pfizer, 773 N.E.2d 720, 731 (Ill. App. 1st Dist. 2002).

Importantly, a plaintiff is not obligated to negate all possible secondary causes of the product's failure.  Gillespie v. R.D. Werner Co., Inc., 71 Ill.2d 318, 375 N.E.2d 1294 (Ill. 1978) (emphasis added).  Instead, the plaintiff must present evidence that tends to negate other reasonable causes of the product's failure and justifies the inference of defect.  Mateika v. LaSalle Thermogas Co., 94 Ill.App.3d 506 (Ill. App. 3rd Dist. 1981).  Further, the types of circumstantial evidence that relates to whether an inference of defect can be drawn include the expected useful life of the product, its purpose, its pre-occurrence maintenance, use or abuse, and the age of the product.  The older the product and the longer it has been out of the control of the manufacturer and in active use, the greater is the likelihood that some intervening instrumentality, such as an external force, unforeseeable misuse or lack of maintenance may have caused its failure.  Mullen v. General Motors Corp., 32 Ill.App.3d 122, 336 N.E.2d 338 (Ill. App. 1st Dist. 1975).  Applying this law to the case requires the denial of defendants' motion.

First, there is no evidence that the plaintiff used the product in any manner other than as intended and in a reasonably foreseeable manner.  Pursuant to the directions of his treating physician, and consistent with the product insert, Mr. Adams wore the first patch for 72 hours, had it removed, and then placed a second patch on his body the night before his death. (Ex. 5, p. 21, 25; Ex. 2 p. 63-64, 57; Ex. 17, RTA #s 4-10).  Thus, there is no evidence of abnormal use.

Second, there is no other reasonable secondary cause or source for Mr. Adams' toxic fentanyl blood level **seven times** greater than expected for a 75 mcg/hr patch. (12.2 ng/ml versus 1.7 ng/ml).  There is no evidence that Mr. Adams did anything improper with the patch and in fact the evidence demonstrates that he used it properly.  (Ex. 17, RTA #6-9).  After it was put on,

all he did was go to bed.  Further, the product was contained in an airtight sealed package the entire time prior to its use.  (Ex. 2, p. 56-57; Ex. 17, RTA #5; Ex. 14, p.35-37).   Additionally, the evidence does not support a finding that the concept or theory of post-mortem redistribution caused the toxic levels of fentanyl in Mr. Adams blood.  See (Ex. 9, Dr. Jacobi at 12-14; 27-28); (Ex. 10, Dr. Evans at p. 44-45); (Ex. 23, Dr. Kaufman p. 3); (Ex. 26, Dr. Leikin).  Because there is no evidence that Mr. Adams abused or misused the patch, it was in a sealed package prior to its use, and the patch was used it as instructed by a physician, there is no reasonable secondary cause of Mr. Adams 12.2 ng/ml toxic fentanyl level.  The only reasonable explanation is that the 75 mcg/hr patch that was designed to safely deliver 1.7 ng/ml of fentanyl of fentanyl over 72 hours failed to do so and was defective.[5]

Third, the evidence is overwhelming that the patch failed to perform in the manner reasonably expected in light of its nature and intended function.  The package insert indicates that a 75 mcg/hr patch is supposed to provide a fentanyl blood level of 1.7 ng/ml with a standard deviation of +/- 0.7 ng/ml.  (Ex. 11, p. 1, Ex. 17, RTA # 10).  Using the patch as prescribed, Mr. Adams nevertheless received a toxic fentanyl dose of 12.2 ng/ml. (Ex. 8, p. 5).  Consistent with this, Dr. Grimm stated that the patch failed to meet his expectations.  (Ex. 5 p. 29-32; 47-48).  Likewise, toxicologists Dr. Evans and Dr. Leikin stated the expectant blood concentration from a 75 mcg patch was 1.7 ng/ml.  (Ex. 10, p. 50; Ex. 26; Ex. 24, p. 51; Ex. 32 p. 1).  Finally, Dr. Kaufman noted the expected Fentanyl level for the patch was 1.7 +/- 0.7 ng/ml and this was clearly exceeded by the post-mortem toxicology values.  (Ex. 23, p. 3).  There is clearly a question of fact as to whether the fentanyl patch designed to provide Mr. Adams with 1.7 ng/ml

---

[5] Defendants claim the fact that neither Linda Adams nor Dr. Jacobi saw anything wrong with the patch to establish there was nothing defective about it. Defendant's argument pre-supposes that Mrs. Adams and Dr. Jacobi would be able to see a defect in the patch or recognize a defect.  See also Kunnemann v. Janssen, 2008 WL 510116  at *12 (noting "everyone who inspected the patch Ms. Kunnemann was wearing when she died found no visible defect.")

of fentanyl over 72 hours failed to perform in the manner reasonably expected in light of its nature and intended function when it provided him with a toxic level of 12.2 ng/ml. Weedon v. Pfizer, Inc., 773 N.E.2d at 731; See also Kunnemann v.Janssen Pharmaceutica Products, L.P., 2008 WL 5101116 (N.D. Ill. Dec. 2, 2008).[6] (Ex. 29).

Relying upon this Court's decision in Shawgo v. General Motors Corporation, 2007 WL 2301315 (S.D. Ill. 2007), defendants argue that plaintiff cannot use the inference of defect doctrine under Tweedy v. Wright Ford because there are other "reasonable secondary cause[s] of the injury." (Defendant's brief, p. 10) (emphasis added). Defendants argue that because Dr. Jacoby stated that he thought that Mr. Adams' circumflex coronary artery occlusion was higher on his list of the causes of Mr. Adams' death, there is a reasonable secondary cause of Mr. Adams death. A review of Shawgo however, clearly demonstrates that the defendant is misreading Tweedy and this Court's opinion in Shawgo.

In Shawgo this court noted that under Tweedy the plaintiff must offer proof that "in the absence of abnormal use or reasonable secondary causes the product failed to perform in the manner reasonably expected in light of (its) nature and intended function." Shawgo at *6. (emphasis added). In other words, a plaintiff must show the absence of reasonable secondary causes for the product's failure. In Shawgo the fatal flaw in the plaintiff's seat belt case was her admission to the hospital nurse that she was not wearing her seatbelt. Id. As a result, there was a reasonable secondary cause as to why the seatbelt failed to perform in the manner reasonably expected in light of its nature and intended function. Id.

---

[6] Judge Keys noted "First, although there is no evidence of any kind of obvious defect in the particular patch involved here, there is evidence in the record suggesting that the Duragesic patch was designed to deliver a level of fentanyl and that the level present . . . at the time of her death was significantly higher than that level. Saying that the patch was defective because it delivered more fentanyl than intended is not the same as saying the patch was defective because [she] died; the latter would clearly run contrary to Illinois law providing that injury alone is not

Here, unlike <u>Shawgo</u>, there is an absence of reasonable secondary causes for the toxic levels of fentanyl found in Mr. Adams bloodstream.  While there may be questions of fact as to whether Mr. Adams circumflex artery occlusion caused or contributed to his death, there is no evidence that any circumflex coronary artery occlusion caused or contributed to the toxic levels of fentanyl found in Mr. Adams bloodstream.  Those levels could have only come from the patch.  Clearly, the Duragesic defendants are confusing <u>Tweedy</u>'s  requirements to exclude reasonable other causes of the products' failure with other possible causes of an injury or death. Under defendants' reading of <u>Tweedy</u> if a person sat in a brand new chair that simply collapsed and the person hit her head and died, and there was conflicting evidence as to whether the individual died of a simple idiopathic stroke or a intracerebral brain hemorrhage from the fall, there could be no recovery. [7]  <u>Tweedy</u> and <u>Shawgo</u> do not stand for this proposition.  <u>Tweedy</u> focuses on whether the product worked as expected, and other reasonable causes for the products' failure, not disputes relating to medical causation.

### <u>c)</u>      <u>Questions of Fact Exist as to Whether the Defective Patch Caused or Contributed to Cause Mr. Adams Death</u>

In a baseless argument, the Duragesic defendants argue that because Dr. Jacoby, an admitted non-expert on toxicological matters, had some uncertainty as to the cause of Mr. Adams' death, there is no material question of fact for a jury on this issue.  However, Dr. Jacoby's testimony alone offers conflicting opinions as to the cause of death so as to create a question of fact.  Second, plaintiff's experts clearly opined to a reasonable degree of certainty that the toxic levels of fentanyl caused or contributed to cause Mr. Adams death.  (Ex. 23, p. 3; Ex. 26).  A question of fact exists.

sufficient to establish a defect, while the former does not. It is a subtle distinction, but it is enough to get the plaintiff to a jury on this issue." <u>Id.</u> at *13.

**d)** **Questions of Fact Exist as to Whether the Duragesic Patch was Defective Under the Risk-Utility Test**

Defendants also claim that plaintiff cannot proceed under the "risk-utility" tests because the ordinary consumer does not have sufficient knowledge about the biological mechanisms of these particular drugs to form an independent expectation about its safety, and that at a minimum the "consumer expectation" prong of the risk-utility test should be tailored to reflect the role of the physician. These arguments have long been rejected by Illinois Courts which have clearly allowed the use of consumer expectations in a medical products context. See Hansen v. Baxter Healthcare Corp., 764 N.E.2d 35, 43 (Ill. 2002) (noting patient could have reasonably expected that her IV catheter connection, if properly designed and manufactured would be safe for its intended purpose); Mele v. Howmedica, 808 N.E.2d 1026, 1037 (Ill. App. 1st Dist. 2004) (noting "even if implantees have no expectation specific to this particular part of the artificial hip, they may have relevant expectations about the safety of the artificial hip as a whole"). Further, even if the plaintiff was held to the standard that the Defendant suggests, the prescribing physician testified this patch did not meet his expectations. Shanks v. Upjohn, 835 P.2d 1189, 1195 (Alaska 1992) (prescription drug is defective if it failed to perform as ordinary doctor would expect).

Additionally, other factors under the risk-utility test demonstrate a valid claim.[8] First, the Duragesic patch design and/or manufacture was unreasonably dangerous because it administered a fentanyl dose that far exceeded what it was supposed to administer. (Ex. 21, p. 55). Second, the most reasonable and likely cause of the fatal fentanyl dose was that it somehow leaked or

---

[7] There would not be a viable claim under Tweedy if there was evidence that someone tampered with the screws holding the chair together before its collapse.

[8] Calles v. Scripto-Tokai, 224 Ill.2d 247, 262-263 (Ill. 2007), noting that a plaintiff is not required to present evidence on all of the risk/utility factors, and once sufficient evidence is adduced, even if it is only for one factor, and reasonable people could differ on the weight to be given the relevant factors a jury question is presented.

provided more fentanyl into his blood stream than designed.  Third, the Duragesic defendants could have reduced the foreseeable risk of fentanyl overdosing by using the matrix system – a safer alternative design incapable of leaking.  (Ex. 14, p. 12-16; Ex. 28 p. 2).  Fourth, and finally, the defendant's failure to utilize a safer alternative design that was already being marketed and distributed by the defendant's in Europe made the patch unreasonably dangerous.  <u>Mikolajczyk v. Ford Motor Co.</u>, 2008 WL 4603565 (Ill. 2008).[9]

<u>e)</u>     <u>Questions of Fact Exists on Plaintiff's Negligence Claim</u>

The Duragesic defendants argue plaintiff does not have a viable negligence claim. Defendant also claims that without an expert that specifically criticizes the design of the patch or the manufacturing process, the plaintiff cannot move forward.  First, with respect to the negligent design issue, the defendant's corporate designee admitted that there was an alternative feasible design that does leak fentanyl gel that was being manufactured and sold as early as 2004.  (Ex. 14, p. 12-16; Ex. 28 p. 2).  Second, with respect to the negligent manufacture, the evidence indicates that Alza was aware of manufacturing defects in its patches since 2001, yet did not implement some of the corrective measures such as the vision system until August 2004, after the FDA investigation and recall although this system was available since 2001.  (Ex. 14, p. 72-73; 65-66).  This evidence clearly presents issues of facts concerning Duragesic exercise of reasonable care in this matter.

Also, defendants fail to address plaintiff's *res ipsa loquitor* allegations and evidence in this case.  Plaintiff has clearly plead that the "in the ordinary course of events, prescription Duragesic patches should not cause death but for the negligence of the defendants."  Mr. Adams

---

[9] Defendants' argument that this claim fails pursuant to Comment K is also erroneous as comment k can only apply if the subject product was properly prepared.  As this product did not perform as expected, it could not have been properly prepared.  Furthermore, the product must be incapable of being made safe.  Defendants manufacture and sale of the matrix patch that cannot leak in Europe forecloses this argument. (Ex. 28).

patch remained in an airtight sealed pouch from the time it was manufactured and distributed by the defendants until it was placed upon Mr. Adams' body the day before his death. Further, the evidence demonstrates that Mr. Adams took the medication exactly as prescribed.

In a *res ipsa loquitor* case, to raise the inference of liability the plaintiff must demonstrate:

> "(1)  that the agency or instrumentality causing personal injury or property damage was, <u>at the time of the creation of the condition causing the injury or damage, under the management or control of the party charged with negligence</u>, and
>
> (2)  that the accident occurred under such circumstances that in the ordinary course of events it would not have occurred if the party so charged had used proper care while the agency or instrumentality was under his management or control." (emphasis added)

<u>Imig v. Beck,</u> 503 N.E. 2d 324, 328 (Ill. Sup. Ct. 1986). As noted by the Fifth District, "it is well established that such control need not be control at the time of the injury, but control at the time of the alleged negligence." <u>Kruger v. Newkirk,</u> 352 N.E. 2d 436, 439 (Ill. App. 5th Dist. 1976). Intervening possession by another party does not destroy the inference of negligence. <u>Id.</u> A showing of control is "sufficient provided Plaintiff proves there was no change in the condition of the instrumentality, and no intervening act which could reasonably have caused the event resulting in injury." <u>Id.</u>  <u>See</u> <u>also</u>  <u>Moore v. Jewel Tea Company,</u> 263 N.E. 2d 636, 648, aff'd 263 N.E. 2d 103 (Ill.)  and I.P.I. 22.01.

Here, James Adams received medication in a sealed airtight container that was designed and manufactured to provide him with a therapeutic fentanyl level of 1.7 ng/ml. Nevertheless it provided him with a toxic fentanyl level of 12.2 ng/ml.  Absent negligence on the part of the defendants, this should not have happened. Clearly, a question of fact exists in support of plaintiff's *res ipsa loquitor* negligence counts. <u>See</u> <u>also</u> <u>Delvecchio v. General Motors Corp.,</u> 255

Ill. App. 3d 189 (Ill. App. 5th Dist. 1993) and <u>Lynch v. Precision Machine Shop, Ltd.,</u> 93 Ill. 2d 266, 443 N.E. 2d 569 (1982).

> **f)      Plaintiff's Claims are Not Pre-Empted by Federal Law**

Failing to acknowledge long established precedent that state product liability claims against pharmaceutical companies are not pre-empted by the Food and Drug Administration, (<u>see</u> <u>Caraker v. Sandoz</u>, 172 F.Supp.2d 1018, 1038-1039 (S.D. Ill. 2001) the Duragesic defendants cite to a medical device case, <u>Riegel v. Medtronic, Inc.,</u> 128 S.Ct. 999 (U.S. 2008), and the amicus brief of the Solicitor General in <u>Wyeth v. Levine</u> to argue plaintiff's claims are pre-empted.  On March 4, 2009, the United States Supreme Court rejected the Solicitor General's position and found there is no preemption of state court pharmaceutical products liability claims. <u>Wyeth v. Levine</u>, ---U.S. ---, No. 06-1249 slip opinion at p. 25 (March 4, 2009).

> **g)      Plaintiff Confesses the Strict Product Liability Claim Against Hook-SupeRx**

Plaintiff confesses subpart (e) of defendants' motion.

## IV.    Conclusion

Because the facts demonstrate that the Defendants' Duragesic patch was defective, Defendants' Motion for Summary Judgment must be denied.

CARLSON & CARLSON, P.C.

By  /s/   Eric J. Carlson                        
         Jon G. Carlson #00392812
         Eric J. Carlson #06228973
         #90 Edwardsville Professional Park
         P.O. Box 527
         Edwardsville, IL 62025
         (618) 656-0066
         (618) 656-0009 fax
         ecarlson@mcleodusa.net

         and

Mark D. Hassakis
HASSAKIS & HASSAKIS
P.O. BOX 706
Mt. Vernon, IL 62864

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS
BENTON DIVISION

| | | |
|---|---|---|
| LINDA G. ADAMS, Independent | ) | |
| Administrator of the Estate of | ) | |
| JAMES E. ADAMS, deceased, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No.: 07-CV-497-GPM-DGW |
| | ) | |
| JOHNSON & JOHNSON, ALZA | ) | |
| CORPORATION, and | ) | |
| JANSSEN, L.P., a/k/a JANSSEN | ) | |
| PHARACEUTICA, L.P., | ) | |
| CVS/PHARMACY #6386, | ) | |
| CVS 6386 IL, L.L.C., HOOK-SUPERX, | ) | |
| INC., HOOK-SUPERX, L.L.C, and | ) | |
| CVS CORPORATION, | ) | |
| | ) | |
| Defendants. | ) | |

**CERTIFICATE OF SERVICE**

I hereby certify that on March 25, 2009, I electronically filed Plaintiff's Response in Opposition to Defendants' Motion for Summary Judgment, with the Clerk of the Court using the CM/ECF system which will send notification of such filing(s) to the following:

Ernest W. Auciello
(Attorney for Johnson & Johnson, Alza Corporation, Janssen, L.P., and Hook-SupeRx, L.L.C.)
ernest.auciello@tuckerellis.com

Robert H. Shultz, Jr.
(Attorney for Johnson & Johnson, Alza Corporation, Janssen, L.P., and Hook-SupeRx, L.L.C.)
rshultz@hrva.com

Courtney Youngblood Jalics
(Attorney for Johnson & Johnson, Alza Corporation, Janssen, L.P., and Hook-SupeRx, L.L.C.)
courtney.jalics@tuckerellis.com

Mark D. Hassakis
(Attorney for Linda G. Adams, Independent Administrator of the Estate of James E. Adams, deceased)
mhass@hassakislaw.com

Respectfully submitted,

BY: _/s/ Eric J. Carlson_____
            Jon G. Carlson, #00392812
            Eric J. Carlson, #06228973
            CARLSON & CARLSON, P.C.
            #90 Edwardsville Professional Park
            P.O. Box 527
            Edwardsville, IL 62025
            (618) 656-0066
            (618) 656-0009 Fax
            ecarlson@mcleodusa.net