**Condensed Transcript**

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF ILLINOIS

LINDA ADAMS, etc.,

       Plaintiffs,

  vs.                      No. 2007-CV-0497-DGW

JOHNSON & JOHNSON, et al.,

       Defendants.
~~~~~~~~~~~~~~~~~~~~~~~~

## THE DEPOSITION OF

## MICHAEL WOLFSON KAUFMAN, M.D.

FEBRUARY 13, 2009
10:00 P.M.

Evanston Hospital
Suite 1927, 2650 Ridge Avenue
Evanston, Illinois

JOANNE H. RICHTER,
a Notary Public within and for the County of Cook,
State of Illinois, and a Certified Shorthand Reporter of said state,
No. 84-2082



Toll Free: 888.486.4044
Telephone: 954.622.1092

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

Exhibit 21

**1**

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF ILLINOIS

LINDA ADAMS, etc.,          )
          Plaintiffs,       )
     vs.                    )  No. 2007-CV-0497-DGW
JOHNSON & JOHNSON, et al.,  )
          Defendants.       )

     The deposition of MICHAEL WOLFSON
KAUFMAN, M.D., called by the Defendants for
examination, taken pursuant to the Federal Rules
of Civil Procedure of the United States District
Courts pertaining to the taking of depositions,
taken before JOANNE H. RICHTER, a Notary Public
within and for the County of Cook, State of
Illinois, and a Certified Shorthand Reporter of
said state, No. 84-2082, at Suite 1927,
Evanston Hospital, 2650 Ridge Avenue, Evanston,
Illinois, on the 13th day of February, A.D. 2009,
at 10:00 a.m.

**2**

1  PRESENT:
2
3     LAW OFFICES OF CARLSON & CARLSON, P.C.
4     (90 Edwardsville Professional Park
5     Edwardsville, Illinois 62025
6     618.656.0066
7     ecarlson@mcleodusa.net), by:
8     MR. ERIC J. CARLSON,
9         appeared on behalf of the Plaintiffs;
10
11    TUCKER ELLIS & WEST LLP
12    (1150 Huntington Building
13    925 Euclid Avenue
14    Cleveland, Ohio  44115-1414
15    216.696.4780
16    ernest.auciello@tuckerellis.com), by:
17    MR. ERNEST AUCIELLO, JR.,
18        appeared on behalf of the Defendants.
19
20  REPORTED BY:  JOANNE H. RICHTER,
21        C.S.R. No. 84-2082.
22
23
24

**3**

1    (WHEREUPON, the witness was duly
2    sworn.)
3    MICHAEL WOLFSON KAUFMAN, M.D.,
4  called as a witness herein, having been first duly
5  sworn, was examined and testified as follows:
6              EXAMINATION
7  BY MR. AUCIELLO:
8    Q.  Sir, would you please state your name,
9  for the record?
10   A.  Michael Wolfson, W-o-l-f-s-o-n, Kaufman,
11 K-a-u-f-m-a-n.
12   Q.  I take it, Doctor, you have given
13 depositions in the past?
14   A.  Yes, sir.
15   Q.  My name is Ernie Auciello.  We met a few
16 moments when ago when I came in the room.
17 I represent the defendants in a lawsuit of
18 Linda Adams versus Johnson & Johnson, et al., in
19 the U.S. District Court for the Southern District
20 of Illinois.
21       We are here to take your deposition
22 because you were identified as a retained expert,
23 is that correct?
24   A.  Yes, sir.

**4**

1    Q.  What your professional address?
2    A.  Department of Pathology,
3  Evanston Hospital, 2650 Ridge Avenue, Evanston,
4  Illinois, 60201.
5    Q.  Your date of birth?
6    A.  11/15/46.
7    Q.  Doctor, I will mark as Exhibit 1, copy
8  of your curriculum vitae, which you have provided
9  for me when I got here.
10   (WHEREUPON, said document was marked
11   Kaufman Deposition Exhibit No. 1,
12   for identification, as of 2/13/09.)
13 BY MR. AUCIELLO:
14   Q.  Doctor, showing you Exhibit 1, is that a
15 true and accurate copy of your current curriculum
16 vitae?
17   A.  I just have to check one thing to see if
18 it's been updated.  Yes, it is complete and up to
19 date.
20   Q.  Doctor, since you have gone through this
21 before, I will dispense with most of the
22 instructions, but, obviously, if you don't
23 understand any question I ask you, please ask me to
24 rephrase it.  I will be happy to.  Okay?



Toll Free: 888.486.4044
Telephone: 954.622.1092

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

Exhibit 21

5

1    A.    Yes, sir.
2    Q.    If you want to take a break at any time,
3  you certainly can do that.  And I don't expect this
4  to be that long, anyway.
5         Tell me, briefly, although I have your
6  curriculum vitae, when did you go to medical
7  school?
8    A.    From 1968 to 1972.
9    Q.    And that was at the University of
10 Chicago?
11   A.    Yes, sir.
12   Q.    After leaving the University of Chicago,
13 what did you do?
14   A.    After I left the medical school,
15 I stayed there as an intern and resident in the
16 department of pathology, finishing up in 1976.
17   Q.    Do you --
18   A.    Then, I took a year off for doing a
19 six-month job and a six-month vacation, and then
20 started my fellowship at the University of Texas,
21 M.D. Anderson Hospital for one year, finishing up
22 in July of 1978.  I came up to Evanston Hospital
23 and I have been here ever since.
24   Q.    Do you have a subspecialty within the

6

1  area of pathology?
2    A.    Yes, I do.
3    Q.    What is that?
4    A.    Anatomic pathology.
5    Q.    Tell us what anatomic pathology means?
6    A.    It is the diagnosis of disease states by
7  the gross visual inspection of tissues, as well as
8  their microscopic visualization, to render a
9  diagnosis upon which treatment is based.
10   Q.    Is that type of pathology that's
11 practiced in a hospital like we are today?
12   A.    Yes, sir.
13   Q.    Do you consider it part of your
14 subspecialty to do forensic pathology?
15   A.    Yes.  I am not a forensic pathologist by
16 board certification, but I certainly have
17 experience in forensic pathology.
18   Q.    Do you routinely do autopsies at this
19 time?
20   A.    Personally do them, or supervise them?
21   Q.    Personally.
22   A.    Every July I do, because I teach the new
23 residents to do autopsies.  So this past July, we
24 did 15.  And then I will see what happens this

7

1  July, but I will do those totally on my own or,
2  certainly, with them, hand in hand.
3         And then during the other eleven months,
4  I might do maybe a couple of more just for private
5  cases, but not hospital cases, because those would
6  be done by our residents.
7    Q.    What are you boarded in?
8    A.    Anatomic pathology and cytopathology.
9    Q.    Just so it is clear, what is
10 cytopathology?
11   A.    That is an area of subspecialization of
12 anatomic pathology in which the diagnosis of
13 disease states is determined by microscopic
14 analysis of either individual cells that are within
15 fluids, or that may be aspirated as microbiopsies
16 or aggregates.  It would be a cellular analysis
17 rather than whole tissues or biopsies or whole
18 organs.
19   Q.    Have you ever held a position for a
20 public entity where you were the person responsible
21 for determining causes of death, such as -- in
22 different states it is called different things --
23 medical examiner, coroner, any position like that?
24   A.    I was a coroner's physician during the

8

1  six months I was working between my residency and
2  fellowship in McHenry County.  I wasn't directly
3  employed by the county, but I was paid by the
4  county to do its forensic cases.
5    Q.    At any other time in your career have
6  you held that role?
7    A.    No.
8    Q.    You indicated you are not boarded in
9  forensic pathology?
10   A.    That's correct.
11   Q.    Are you board eligible in forensic
12 pathology?
13   A.    No, I am not.
14   Q.    What would you need to become board
15 eligible in forensic pathology?
16   A.    At this point, I would need to do a
17 fellowship year in forensic pathology, and then
18 take the exam.
19   Q.    Do you know Dr. Jacobi?
20   A.    No, I don't.
21   Q.    You have not, to your knowledge, met him
22 at any professional conferences?
23   A.    Not to my knowledge, no.
24   Q.    You are licensed in the state of



ESQUIRE
an Alexander Gallo Company

Exhibit 21

Toll Free: 888.486.4044
Telephone: 954.622.1092

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

9

1  Illinois, correct?
2      A.   Yes.
3      Q.   Are you currently licensed in any other
4  state?
5      A.   Yes, sir.
6      Q.   What other states?
7      A.   California, Texas and New York.
8      Q.   Is there a reason why you are licensed
9  in California, Texas and New York?
10     A.   California was because my original
11 intent was to do a residency out there and stay out
12 there. Life takes its strange turns. I never went
13 out there. But I maintained a license because
14 people said if you ever wanted to practice there in
15 the future, that it's best to keep it once you have
16 had it.
17         I have also worked out there during the
18 years covering my friend who did go out there, so I
19 have been out there a few times covering him, but
20 not recently.
21         Texas was because I did my fellowship
22 there, and for the same reason, I was told that it
23 would be a good idea to maintain that license.
24         New York, that was Plan B, if I wasn't

10

1  going to California, that I was going to go to
2  New York, so I got my license there in anticipation
3  of moving there after my residency, and that never
4  happened, but everybody said you might as well keep
5  those licenses as long as you have them.
6      Q.   Okay. Your position now, I believe you
7  might have said. What is your title here?
8      A.   I am a senior attending pathologist in
9  the department. I am also director of autopsy
10 services for the Evanston Hospital Corporation.
11 I also am the medical director for our Outreach
12 Laboratory Services Corporation.
13     Q.   What are autopsy services in the
14 hospital?
15     A.   We provide the autopsy service. So,
16 I mean, now, we have four hospitals in our unit
17 that all the deceased who wish an autopsy get done
18 here. We also do autopsies for the hospices and
19 nursing homes, which are affiliated with the
20 hospital, so we will do those here, and I am the
21 director of that service.
22     Q.   Is that the context in which you do the
23 15 or so autopsies every July?
24     A.   Yes.

11

1      Q.   And during the rest of the year, who
2  does autopsies?
3      A.   The residents always do them once they
4  get trained, so they do them and we, as attendings,
5  supervise them on a weekly basis.
6          But because I put in four or five weeks
7  in July, I, generally, don't have to do much more
8  than one or two weeks during the regular year since
9  we have about eleven people who rotate.
10     Q.   Doctor, I see you have a listing of
11 publications and presentations in your curriculum
12 vitae.
13         Are any of these, in your mind, of
14 particular relevance to the issues presented in
15 this case?
16     A.   No, sir.
17     Q.   Have you ever published on toxicology?
18     A.   Not, per se, no.
19     Q.   Obviously, I would expect that you would
20 consider yourself an expert in pathology?
21     A.   Yes, sir.
22     Q.   Obviously, anatomic pathology, correct?
23     A.   Yes.
24     Q.   Do you consider yourself an expert in

12

1  forensic pathology even though you don't have a
2  board?
3      A.   Yes, I do.
4      Q.   What's the basis for that?
5      A.   Six months' work experience; two, is
6  that many of the cases that we do have forensic
7  implications. In addition to the Evanston Hospital
8  cases, we have a private autopsy service, which has
9  contracts with other hospitals, as well as private
10 families, so that we will do cases which are
11 medical examiner cases, but, for one reason or
12 another, the medical examiner will not choose to
13 do, but we will do those cases.
14         We will do re-autopsies. If someone
15 dies in jail, we may by request of the family do a
16 re-autopsy.
17         In addition, I have a medicolegal
18 consulting practice, in which a certain percentage
19 of those cases are of medicolegal import, criminal
20 matters, so that I have done three dozen trials of
21 criminal cases in which pathology was an issue, so,
22 that experience base.
23         So, certainly, in terms of my training
24 in pathology, as well as my work experience and



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044
Telephone: 954.622.1092

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

Exhibit 21

## 13

1  education, certainly, I feel qualifies me to have
2  expertise in forensic pathology, even though I have
3  not done a formal fellowship in that discipline.
4      Q.  Do you consider yourself an expert in
5  pharmacology?
6      A.  Not, per se, no.  The expertise in
7  dealing with drugs is, really, as an anatomic
8  pathologist, utilizing the information that's
9  generated by the toxicology people, who generate a
10  number that I would take and utilize in concert
11  with all the other information that I have to
12  determine the cause and manner of death, what is
13  the approximate cause, what are contributing
14  factors or what are non-issues and that, sifting
15  through all of the pieces of the puzzle.
16      Q.  But, essentially, you don't consider
17  yourself an expert in pharmacology?
18      A.  Correct.  I don't run the laboratories
19  or do the testing.  I know what to test for, when
20  appropriate.  I get the results back.  I interpret
21  the results in the context of the case.
22      Q.  All right.  And a similar question, do
23  you consider yourself an expert in toxicology?
24      A.  The same answer would apply.

## 14

1      Q.  And it would be the same answer for
2  forensic toxicology?
3      A.  I don't distinguish the two, because
4  virtually all toxicology has forensic implications,
5  so that when toxicology is done, certainly, in an
6  autopsy case, it invariably will have implications
7  not only in terms of the cause of death, but
8  circumstances surrounding the death.
9      Q.  Are you familiar with the concept of
10  postmortem redistribution of drugs?
11      A.  Yes, I am.
12      Q.  How so?
13      A.  Well, in dealing with drug levels and
14  in, basically, reading about them and talking to
15  our own toxicologists whether this is important or
16  not, knowing when we do take blood or other
17  sampling where it is taken from, to deal with that
18  issue, either in terms of doing it ourselves if it
19  is our case or in reviewing other peoples' work
20  product, as to where the source of the fluid or
21  tissue was that was tested.
22      Q.  Do you consider yourself an expert in
23  postmortem redistribution of drugs?
24      A.  Only to the extent of what the

## 15

1  literature says, since I don't do the testing
2  myself.  I am aware of its existence.  I am aware
3  of why it may happen in certain cases.  And whether
4  it involves any one given case or not is really
5  part of the factors that one deals with in terms of
6  interpreting a given value and the significance of
7  that value in the context of a given case.
8      Q.  Would postmortem redistribution be an
9  area which you would defer to a toxicologist?
10      A.  Well, the concept, no, the concept is
11  pretty clear.  On any given drug, there are
12  published, on any given drug, wide ranges of
13  postmortem redistribution and it is usually what's
14  called a factor.
15          Now, some of these factors have such
16  wide ranges as to make them almost incomprehensible
17  to have a formula.  And, in fact, sometimes, it is
18  less than one, such that the heart, which is
19  allegedly the site of higher concentrations, may,
20  in fact, have a lower level than what may be
21  peripherally.
22          And so when you have a circumstance like
23  that, you have to judge whatever value you have,
24  from whatever the source is, whatever the

## 16

1  literature indicates, and how these values,
2  regardless of the range, tie in to all the other
3  factors of the case for you as the ultimate decider
4  of the cause and manner of death, what relative
5  importance these factors have.
6      Q.  But my original question is whether you
7  consider yourself an expert in postmortem
8  redistribution.
9          And if I understood, your answer would
10  be only as you get it from the literature?
11      A.  Well, that's the only place that one
12  could have a source.
13          In other words, the toxicologist does
14  the testing.  Just generates a number.  If there is
15  concern that a given drug has postmortem
16  redistribution, then it is just a question of, for
17  a given case, you would have to do simultaneous
18  values that are in peripheral blood and central
19  blood in the heart on any given case.  Most times
20  it is not done.
21          If it is done, then that's a number.  If
22  you have a series of such numbers, they may be
23  published, and then Publisher A has a certain
24  series, Publisher B has a certain series.



Toll Free: 888.486.4044
Telephone: 954.622.1092

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

ESQUIRE
an Alexander Gallo Company

Exhibit 21

Michael Wolfson Kaufman, M.D.                                    February 13, 2009

---

**17**

1   All I am trying to indicate is that the
2   range at times is very high, and, in fact, that
3   ratio can be less than one, so that it may work the
4   other way, as well.
5       But if you have a circumstance where on
6   a given case you only have one value, you can't
7   argue that, "Well, therefore, there is such a wide
8   range that the average is so and so, therefore,
9   I can opine what the value would have been in a
10  peripheral site."
11  Q.   When you talk about ratios, are you
12  talking about the ratio between a drug found in
13  peripheral blood as opposed to heart or central
14  blood?
15  A.   Yes.
16  Q.   Do you have any expertise in comparing
17  the value or the levels of drugs in postmortem
18  blood versus antemortem blood?
19  A.   Well, it is the same problem, because if
20  you take -- depending on where you are getting the
21  blood, because antemortem blood, generally, is
22  going to be from a peripheral site.
23      And, generally, if you take postmortem
24  blood, it is not going to be from the same

---

**18**

1   peripheral site, so you have a problem.
2       And also it depends on the time frame
3   between when the blood was drawn antemortem and
4   death, so there would be a certain metabolism
5   factor going on, anyway.
6   Q.   Are you familiar with any studies
7   comparing antemortem fentanyl levels with
8   postmortem fentanyl levels?
9   A.   The values that are in the literature in
10  terms of product distribution are antemortem in the
11  sense of, if you are given -- in other words, the
12  studies to determine blood levels are done on
13  people who are alive.
14      So in other words, if you have a
15  fentanyl patch, you would expect, after steady
16  state of, say, 72 hours, the value is going to be
17  such and such with a standard deviation.  That
18  would be an antemortem value.
19      Now, if you take a postmortem value,
20  part of the problem is that you don't know
21  necessarily when the drug was given relative to
22  death, and you don't know when any given drug may
23  have been effected by postmortem redistribution.
24  Q.   Are you familiar with any studies that

---

**19**

1   compare the level of antemortem drug levels -- and
2   I am using the fentanyl, but any other drug you can
3   think of -- of an antemortem level with a
4   postmortem level?
5   A.   All I can tell you is what I read in the
6   toxicology books I refer to, when I am dealing with
7   a given case.
8       And, generally speaking, if it is a
9   forensic pathology literature, they are not talking
10  about antemortem levels.  They are talking about
11  postmortem levels.
12      Generally speaking, the antemortem
13  levels are done in, not drugs of abuse, but by
14  therapeutic drugs.  And those are done,
15  essentially, to determine what the blood levels
16  are, the peaks and the troughs, whether they be
17  antibiotics or narcotics, et cetera.
18      So in the case of fentanyl, they will
19  have a level of drug that would reflect what the
20  blood level would be in a steady state situation.
21      They will have studies where there would
22  be other kinds of drugs where you would say peak
23  value -- just take, for instance, alcohol -- what
24  it would be.  For instance, alcohol would be a good

---

**20**

1   example.  You can have a blood level drawn right
2   before somebody dies, and take the blood level
3   right after the death, and, theoretically, it would
4   be the same.
5   Q.   But my question was, whether you are
6   familiar with any study that compared fentanyl or
7   other drugs taken, measured antemortem, in the same
8   patient, then measured postmortem?
9   A.   No, because the studies that I have read
10  have been postmortem studies.
11  Q.   You happen to have, we will get to it
12  later, Anderson and Muto study here?
13  A.   That was from a previous case I worked
14  on.
15  Q.   Anderson and Muto discusses the ratios
16  between central blood and peripheral blood,
17  correct?
18  A.   They talk about it.  And if you look at
19  their cases, some of them had levels that were
20  drawn from central, as well as peripheral.  Many
21  had one or the other, but not both.
22  Q.   Right.  But there were no antemortem
23  levels measured in Anderson and Muto?
24  A.   Correct.

---



**ESQUIRE**
an Alexander Gallo company

Toll Free: 888.486.4044
Telephone: 954.622.1092

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

Exhibit 21

Michael Wolfson Kaufman, M.D.                      February 13, 2009

---

21

1    Q.   Do you consider yourself an expert in
2    cardiology?
3    A.   In clinical cardiology, no.
4    Q.   How about in cardiac pathology?
5    A.   Yes, I do.
6    Q.   What's the basis for that?
7    A.   The basis for that being that I, as a
8    surgical pathologist, we get material from the
9    heart, heart valves, myocardial biopsies, pieces of
10   heart from aneurysm repairs, pieces of aorta or
11   other peripheral vessels that we review in autopsy.
12   Virtually, every autopsy, we will have a detailed
13   examination of the a heart.  And I think that that
14   certainly qualifies me over the last 35 years or so
15   of that kind of expertise.
16   Q.   Have you ever published in the area of
17   cardiac pathology?
18   A.   I have one article, yes.
19   Q.   Could you tell me which one that is?
20   A.   Publication No. 3.  Title doesn't give
21   it justice what the study was about, but it was on
22   heart pathology.
23   Q.   In rabbits?
24   A.   Yes.

---

22

1    Q.   Before this case, did you know who
2    Stephen Factor was?
3    A.   I had been on a case, on opposite sides
4    of the case, where he was an expert.  I forget
5    which side who was on, but we were on opposite
6    sides.
7    Q.   Other than that, had you had any contact
8    with him?
9    A.   No, I didn't have contact with him then.
10   Q.   You knew him?
11   A.   I knew of him.
12   Q.   Is there anyone here at Evanston
13   Hospital that specializes in cardiac pathology?
14   A.   No.
15   Q.   Do you ever consult with pathologists
16   who specialize in cardiac pathology?
17   A.   First of all, let me take that back.  We
18   just had someone come up from Northwestern who is
19   an expert in neonatal or baby congenital heart
20   disease, but I don't count that.
21        But do I consult with anybody for heart
22   pathology issues?
23   Q.   Do you?  Yes.
24   A.   No, I don't.

---

23

1    Q.   Never have?
2    A.   No.
3    Q.   By the way, going back, you mentioned
4    that there were publications relating to toxicology
5    that you would use.  What would those publications
6    be?
7    A.   The ones that I own.  I have them on my
8    shelf here.  I have got the Baselt textbook.
9    I have got the Karch textbook.  I have got the
10   Ellenhorn textbook.  Those would be my three main
11   ones that I use.
12   Q.   Do you rely on them?
13   A.   Yes, I rely on them in the sense that
14   they are referral books.  They have reliable
15   information.  They are, certainly, not either --
16   none of them are authoritative in and of
17   themselves, but I think they are reliable reference
18   sources, yes.
19   Q.   In particular, I can see Baselt.
20   Baselt's chapter on fentanyl, do you find that
21   reliable?
22   A.   Yes, to the extent that it is a reliable
23   resource.  But, again, it is a question of
24   reliability versus it being authoritative.  It is

---

24

1    not authoritative.
2    Q.   The Baselt book has data in it, correct?
3    A.   Yes.
4    Q.   Do you question the data in the Baselt
5    book as it relates to fentanyl?
6    A.   I don't question the data in anything.
7    I mean I just -- it is, basically, a purview of
8    what the literature is, with the various
9    references.
10        I don't think he has a particular bias,
11   shall we say, on any given literature, but I would
12   read it and take the information there and
13   coordinate that with all the other factors of the
14   case, so whatever the toxicology --
15        You have to remember what a forensic
16   pathologist does, or what an autopsy pathologist
17   does is he or she takes information from all sorts
18   of stuff, clinical records, radiology, from
19   consultations, from slides, for any toxicology, any
20   other biochemistry, put all of that information
21   together, and come up with what, in your opinion,
22   is the best fit, and that's what you do.
23        So as far as the Baselt information
24   goes, it may be what it is.  It is not anything

---



Toll Free: 888.486.4044
Telephone: 954.622.1092

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

Exhibit 21

|  | 25 |  | 27 |
|---|---|---|---|
| 1 | more than relaying what -- and, basically, | 1 | Baselt that states that the studies that they |
| 2 | parroting what's out there from other articles, so | 2 | looked at, looking at peripheral to central ratios, |
| 3 | every chapter on any drug will have multiple | 3 | they average 1.6? |
| 4 | references, and that is just the reality. | 4 | A.   First of all -- |
| 5 | Q.   Did you use or rely on the Baselt book | 5 | Q.   -- with fentanyl, I should say? |
| 6 | in reaching your opinions in this case? | 6 | A.   Right, there are probably many |
| 7 | A.   No, I did not. | 7 | references to that.  But the 1.6 is an average in |
| 8 | Q.   Are you familiar with Dr. Karch's book? | 8 | and of itself, so that half them are less than 1.6. |
| 9 | That's the other one. | 9 | As I said, some of them are even less than 1.0. |
| 10 | A.   I am familiar with it.  I have used it, | 10 | Q.   My question was, do you agree with it? |
| 11 | yes. | 11 | A.   No, I don't agree -- I agree that that |
| 12 | Q.   Likewise, you would find the data in | 12 | was their conclusion.  I could also say there are |
| 13 | there to be reliable? | 13 | other articles that may say it is higher and may |
| 14 | A.   Well, again, it relates to people's | 14 | say it may not be a factor at all. |
| 15 | work.  I don't think any of these guys do, | 15 | What I am saying is all you can say is |
| 16 | necessarily, research on every single drug.  They | 16 | that even taking 1.6, (a), it doesn't apply in this |
| 17 | rely on what's there in the literature as a review, | 17 | case because we have a peripheral blood draw; (b), |
| 18 | so I think that's reliable, but not authoritative. | 18 | even if you were to take 1.6 and say it is a |
| 19 | Q.   How do you define "authoritative"? | 19 | central blood draw, and you divide the 12.2 by 1.6, |
| 20 | A.   Basically, whatever is said there is the | 20 | you still have a value that's far and above |
| 21 | absolute truth.  There is no reason for anybody | 21 | standard deviations for what a therapeutic level -- |
| 22 | else to write anything else, because it is the word | 22 | Q.   I am talking about postmortem |
| 23 | of God. | 23 | redistribution, not -- |
| 24 | Q.   What edition of Baselt do you have? | 24 | A.   What I am saying is that I don't agree |

|  | 26 |  | 28 |
|---|---|---|---|
| 1 | A.   7th. | 1 | that any postmortem distribution applies in this |
| 2 | Q.   Is there an 8th out now? | 2 | case, number one. |
| 3 | A.   I don't know, because I was reading | 3 | Number two, even if you were to argue |
| 4 | in -- Dr. Evans makes reference to an 8th edition, | 4 | that it was, you don't know what that number is. |
| 5 | and I thought I had the most recent one.  And I | 5 | Three, even if you were to take 1.6 as |
| 6 | think this is dated about 2004, so if there is a | 6 | the ratio and say, "Well, the 12.2 is really 1.6 |
| 7 | new one, I am not aware of it. | 7 | higher than what it really was," you still have a |
| 8 | Q.   Doctor, unless I have mixed this up, in | 8 | value -- do the math -- of 7.625, which is |
| 9 | the retained witness disclosure given to me by | 9 | multiples over what the drug manufacturer says that |
| 10 | plaintiffs, there is a reference to Baselt. | 10 | the steady state level should be after 72 hours of |
| 11 | Is that something you provided counsel? | 11 | 1.7, plus or minus .5 or .7, as standard deviation. |
| 12 | A.   It may be whatever -- I think I gave a | 12 | So you have a number that is multiples over that, |
| 13 | copy of this to Mr. Carlson.  That may be his | 13 | that cannot be accounted for by the normal usage of |
| 14 | chapter in there. | 14 | that drug. |
| 15 | Q.   It appears to have two pages, or the | 15 | Q.   Is what you are telling me, is that an |
| 16 | fentanyl chapter in Baselt -- | 16 | issue of toxicology or pathology? |
| 17 | MR. CARLSON:  That's even possible that's what | 17 | A.   Is what, the number? |
| 18 | was attached to Dr. Leikin's report, too, because | 18 | Q.   The analysis you just gave me of trying |
| 19 | he was provided a copy of that, so I don't know. | 19 | to calculate whether blood level could be |
| 20 | BY THE WITNESS: | 20 | consistent with a therapeutic dose. |
| 21 | A.   That may have been research I did for | 21 | A.   That, you can just get from product |
| 22 | the DiCosolo case. | 22 | literature.  In other words, the product literature |
| 23 | BY MR. AUCIELLO: | 23 | states that the value of the fentanyl patch, the |
| 24 | Q.   Would you agree with the reference in | 24 | 75-milligram patch after 72 hours of steady state, |



ESQUIRE
an Alexander Gallo Company

Exhibit 21

Toll Free: 888.486.4044
Telephone: 954.622.1092

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

### 29

1 would be 1.7 nanograms per milliliter plus or
2 minus .5 or .7. That's out there in the drug
3 literature. That's what they are proposing --
4 that's what they are saying.
5     So if you have that as the baseline, and
6 that's what it should be, even taking the 12.2,
7 even dividing that by 1.6, you still come up with a
8 number that is now 4-1/2 times what it should have
9 been.
10     So I am just saying that that is a
11 toxicologic analysis. But what my job is as
12 pathologist is to take that toxicologic analysis
13 and factor that in to all of my information about a
14 given case as to its significance or
15 insignificance.
16     Q.   And isn't it true that Anderson and Muto
17 found a range of postmortem redistribution that
18 went from as low as 0.7 to as high as 4.6?
19     A.   That's true.
20     Q.   And if Mr. Adams had an antemortem level
21 of 3, a postmortem redistribution in a ratio less
22 than 4.6 could account for the postmortem findings?
23     A.    No, because the blood that was drawn in
24 this case was not central blood. When they talk

### 30

1 about right heart blood, they talk about getting
2 blood from the inferior vena cava.
3     This was blood up in the neck,
4 subclavian superior vena cava. Wherever this was
5 from was not in what I would describe as central
6 cardiac blood.
7     Q.   What vessel was the blood taken from
8 this case?
9     A.   Dr. Evans thought it was the subclavian.
10 I was under the impression, normally, if you were
11 to get blood there, the only place you could get
12 blood would be the superior vena cava.
13     Q.   Is it your opinion that peripheral blood
14 does not experience postmortem redistribution?
15     A.   No, because that's the basis of the
16 ratio. The ratio is the peripheral, which many
17 people use as femoral blood, but it is that ratio
18 of femoral blood to central cardiac blood that
19 defines the redistribution.
20     Because, otherwise, you could say,
21 "Blood taken antemortem is redistributed. What
22 makes antemortem blood any different than
23 postmortem blood?"
24     Q.   My question was, does postmortem

### 31

1 redistribution occur in peripheral blood?
2     A.   No, because that defines the baseline.
3     Q.   So antemortem levels would be the same,
4 if you could take fentanyl levels in the patient
5 before they died --
6     A.   And then immediately kill them?
7     Q.   -- and shortly after their death, the
8 antemortem level would match the peripheral?
9     A.   If you had enough of a large series,
10 yes.
11     Q.   Have you seen any literature where
12 antemortem -- I think I asked you this --
13 antemortem levels, even inadvertently were obtained
14 in the same patients and, thereafter, a postmortem
15 peripheral draw was done?
16     A.   No.
17     Q.   Would you find that useful if that were
18 done to look at the results?
19     A.   No.
20     Q.   Why not?
21     A.   Because I cannot imagine how you would
22 know when a patient was about to die. And
23 factoring in the metabolism of the drug that goes
24 on in between, the manner in which the blood was

### 32

1 drawn antemortem, how much of a dilutional factor
2 there may have been in terms of how the blood was
3 obtained, it is just not obtained in the same
4 fashion.
5     I have never heard of such studies that
6 would show such a striking difference. I mean, all
7 of forensic toxicology is predicated on, basically,
8 postmortem levels of drugs of abuse.
9     If you have normal drugs, they are based
10 on what the level of therapeutic level would be,
11 given the way a drug is administered. And then you
12 compare them to decide whether the levels there are
13 of a value that are toxic, that are fatal or
14 associated with fatalities, and how those values,
15 when generated, compare with other factors that may
16 be a more competent cause of death.
17     What you are looking for in an autopsy
18 is the most competent cause of death, and you take
19 all of these factors involved.
20     Q.   My only question was whether or not if
21 there were a study that showed a differing value
22 between an antemortem blood draw shortly before
23 death and a peripheral draw, that would not be
24 instructive to you? You wouldn't find that -- that



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044
Telephone: 954.622.1092

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

Exhibit 21

Michael Wolfson Kaufman, M.D.                    February 13, 2009

---

33

1  wouldn't change your opinion?
2      A.   It wouldn't change my opinion.  It may
3  be instructive, but it wouldn't change my opinion.
4      Q.   Is your opinion that the blood drawn in
5  this case was peripheral?
6      A.   Yes.
7      Q.   Where did Dr. Jacobi say he drew the
8  blood?
9      A.   He said he drew it in the neck area.
10     Q.   Was it loose blood?
11     A.   It wasn't quite clear to me.  It sounded
12  like it was coming from the superior vena cava,
13  that he was getting blood that was in the neck
14  region that may have been -- when he opened it up,
15  and he may have sliced into the jugular vein and he
16  was drawing blood out of that area, or the superior
17  vena cava coming down from the subclavian.
18         My impression was that he was getting
19  blood from that area.  And whether he actually put
20  a needle into the actual lumen of the vein, or in
21  the course of doing the neck dissection there was
22  loose blood there that he got out, one way or
23  another, that was blood that came from the region
24  of the right subclavian jugular superior vena cava

---

34

1  area.
2      Q.   It wouldn't matter to you if it was
3  loose blood in the chest?
4      A.   No.
5      Q.   Are you an expert in pharmacokinetics of
6  drugs?
7      A.   No, not -- no.
8      Q.   Doctor, you provided me a list of
9  depositions.
10     A.   And trials.
11     Q.   And trials.  Do you know how many
12  depositions and trials are listed on here?
13     A.   No.
14     MR. AUCIELLO:  Please mark this as Exhibit 2.
15         (WHEREUPON, said document was marked
16         Kaufman Deposition Exhibit No. 2,
17         for identification, as of 2/13/09.)
18  BY MR. AUCIELLO:
19     Q.   When were you first engaged to be an
20  expert in this case?
21     A.   September 18th, 2008.
22     Q.   Seems obvious, but I will just make
23  sure, for the record, but you had nothing do with
24  the autopsy of James Adams in 2005?

---

35

1      A.   That's correct.
2      Q.   Am I to understand that you disagree
3  with the findings of Dr. Jacobi in his finding that
4  Mr. Adams died of a cardiac cause of death?
5      A.   I do disagree, yes.
6      Q.   You understand that Dr. Jacobi had the
7  benefit of doing the autopsy himself, correct?
8      A.   Well, I am not sure that's an advantage,
9  but he did the autopsy himself.
10     Q.   You are telling me, between you and he,
11  the pathologist who does the autopsy doesn't have
12  an advantage in reaching conclusions over another
13  pathologist who reads what he wrote and looks at
14  slides?
15     A.   No, because his written record is what
16  he saw, what he did.  The slides I looked at, which
17  is his work product, the drug data that was
18  generated was generated from a report which both he
19  and I had the advantage of seeing.  His gross
20  descriptions and what they are, they are in written
21  form.
22         So I do not see the advantage that he
23  has having done the autopsy and, theoretically,
24  writing down everything he saw and did, from me

---

36

1  receiving that work product.
2      Q.   So you are in just as good a position to
3  evaluate the cause of death of James Adams as is
4  Dr. Jacobi?
5      A.   Yes, I am.  Plus, I would say, in some
6  ways, better.  In the sense that when he wrote the
7  report, he either did not know, necessarily, the
8  entire history.  He did not -- he made a certain
9  assumptions that Mr. Adams was a chronic user of
10  the fentanyl patch, when, in actuality, he was a
11  novice.  This was only his second patch.
12         One could argue that I had more
13  information than he did, and am in a better
14  position to talk about his case.  And I am not even
15  talking about issues of general experience base in
16  terms of what we do and how we evaluate things to
17  suggest that he is at an advantage over me.
18  I disagree with that completely.
19     Q.   Dr. Jacobi concluded that Mr. Adams died
20  of a cardiac arrythmia.  Is that a correct
21  statement of his finding?
22     MR. CARLSON:  Object to form.
23  BY THE WITNESS:
24     A.   Everybody dies of cardiac arrythmia, so

---

**ESQUIRE**
an Alexander Gallo Company

Toll Free: 888.486.4044
Telephone: 954.622.1092

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

Exhibit 21

Michael Wolfson Kaufman, M.D.                                    February 13, 2009

---

37

1    that is a useless concept.
2    BY MR. AUCIELLO:
3        Q.    I will rephrase the question.  What did
4    Dr. Jacobi list as the cause of death?
5        A.    Well, ultimate severe coronary artery
6    atherosclerosis, with the contributing factor of a
7    toxic level of fentanyl.
8        Q.    Now, do you disagree with severe cardiac
9    atherosclerosis?
10       A.    Well, if you take 70 percent, 70 percent
11   is not considered severe.  75 percent plus is
12   considered severe.  That's quibbling.  I agree with
13   him it was 70 percent, so.
14       Q.    You agree with him that that caused his
15   death?
16       A.    No, I disagree that caused his death.
17       Q.    You disagree with Dr. Factor, as well?
18       A.    Yes, I do.
19       Q.    You disagree with Dr. Evans, the
20   toxicologist?
21       A.    In terms of what?
22       Q.    Any of his findings related to this
23   case.
24       A.    He didn't really have any findings.  He

---

38

1    was just relating what he did, how he did it, and
2    what values they were.  He was noncommittal about a
3    lot of things that he should have been noncommittal
4    about.  He, certainly, did not opine about the
5    cause of death.
6        Q.    At the time of trial, are you going to
7    question the competence of Dr. Jacobi?
8        A.    No.
9        Q.    You admit to me that he is a competent
10   forensic pathologist?
11       A.    He is a competent pathologist.  It is
12   just a question of differing opinions.  Clearly,
13   his competency led him to believe that the value of
14   fentanyl was toxic, even knowing or questioning
15   whether there was postmortem redistribution,
16   whether postmortem values equaled or unequaled
17   antemortem values, or anything like that.  His
18   conclusion was that it was a toxic value.
19           Now, he wasn't aware that this was the
20   first go-around.  He certainly was, in my mind,
21   unappreciative -- you want me to critique his --
22       Q.    I just want to know when we get to trial
23   whether you are going to make aspersions onto the
24   abilities of Dr. Jacobi.  Are you going to say he

---

39

1    is less than competent, less than educated,
2    anything like that?
3        A.    No, I will not.  I will just say we
4    reached different conclusions, and I will give you
5    reasons why I believe my opinions, based on his
6    data that he generated, I think, in my opinion,
7    lead to a different conclusion.
8        Q.    Now, you would agree that when
9    Dr. Jacobi did the autopsy, though, he was not
10   being paid by either party to this lawsuit?
11       A.    That's correct.
12       Q.    He was doing it as a part of his
13   ordinary day-to-day function?
14       A.    That's correct.
15       Q.    You, when you looked at it, are doing it
16   having been retained by the plaintiffs, correct?
17       A.    I am looking at it in a completely
18   objective fashion.  To suggest that because I am
19   paid by the plaintiff I will shade my opinions
20   based on what the plaintiff wants me to say,
21   I think is clearly mischaracterization of what my
22   role here is.
23           My role, frankly, is to be a friend of
24   the court, to explain to the court what my take on

---

40

1    this is.  And, believe me, if I didn't agree with
2    what I am saying here, I wouldn't be sitting here
3    and Mr. Carlson would have to get somebody else.
4        Q.    But my question was, simple, that when
5    you reviewed this, you did it when you were hired
6    by the plaintiffs to do this and you are being paid
7    by the plaintiffs?
8        A.    That's correct.
9        Q.    What is your charge for doing consulting
10   work such as this?
11       A.    My charge for consulting work is $300 an
12   hour.  For deposition time, it is $400 an hour.
13       Q.    And I don't want to add all of these up.
14   How many cases involving pharmaceuticals have you
15   been involved in before?
16       A.    Multiple, I mean, if you include
17   alcohol, but there are drug cases where there have
18   been drug overdoses or contributing factors.
19           In terms of total cases I have been
20   consulted with over the last 27 years or so, it is
21   probably about 800 by this point.  I get about
22   50 cases a year.  Clearly, maybe be three or four
23   involve some sort of drug overdose or alcohol
24   intoxication.

---



ESQUIRE
an Alexander Gallo Company

Exhibit 21

Toll Free: 888.486.4044
Telephone: 954.622.1092

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

Michael Wolfson Kaufman, M.D.                          February 13, 2009

---

**41**

1    Q.    You said you were engaged in a previous
2    case called DiCosolo?
3    A.    Yes, sir.
4    Q.    Did you render opinions or issue a
5    report in that case?
6    A.    The written report, I don't know.
7    Clearly, the lawyer who had retained me knew of my
8    opinions, but, apparently, it was not necessary for
9    me to -- as I said, I, certainly, didn't testify at
10   the trial. I read about the results in the
11   newspaper, like everybody else, and I don't
12   honestly recall whether I was ever deposed on that
13   case.
14   Q.    You don't believe you issued a report?
15   A.    I don't know. I don't remember.
16   Q.    In this stack of material here that's
17   clipped, and the top item is the Anderson and Muto
18   material, this is something that you obtained
19   through that case?
20   A.    Well, it was either given to me or
21   I generated it myself, so I could tell you which
22   was which, but -- did you want me do that?
23   Q.    No.
24   A.    For instance, here this article I got

---

**42**

1    myself, because it was gotten from our hospital
2    library here.
3    Q.    When did you start doing consulting
4    work?
5    A.    About 1981.
6    Q.    Is it all civil cases or civil and
7    criminal?
8    A.    Some criminal cases. Probably about
9    50 criminal cases over the years.
10   Q.    Out of approximately 800?
11   A.    800, approximately 800.
12   Q.    Excluding the criminal cases, is there a
13   ratio as to how often you are retained by the
14   plaintiffs in a civil suit versus the defendants in
15   a civil suit?
16   A.    It is about two-thirds defense and about
17   one-third plaintiff, and that's really in medical
18   malpractice.
19         I don't view this as that kind of case.
20   Any of the toxicology/alcohol kinds of auto
21   accidents, I have no knowledge because the sides
22   are always strange and I never know.
23   Q.    Are most of your cases medical
24   malpractice cases?

---

**43**

1    A.    Yes.
2    Q.    I would take it, most of the criminal
3    cases involve substances like alcohol?
4    A.    Most of them involve somebody who died,
5    usually by violent means, and alcohol may have been
6    there, but it wasn't necessarily the major event.
7    Q.    Have you ever worked with Mr. Carlson
8    before?
9    A.    No, I have not.
10   Q.    Since we have the Anderson and Muto
11   studies sitting in front of us, do you regard the
12   Anderson and Muto study as being reliable or
13   authoritative?
14   A.    Certainly, not authoritative. It is
15   reliable only to the extent that it relates data
16   either generated from their studies or other
17   peoples' studies. But that's all you could say.
18   It is just one article in which there are many
19   other articles that probably exist.
20         MR. AUCIELLO: Let's move on to your report.
21         (WHEREUPON, a document was marked
22         Kaufman Deposition Exhibit No. 3,
23         for identification, as of 2/13/09.)
24   BY MR. AUCIELLO:

---

**44**

1    Q.    Doctor, is Exhibit 3 a true and accurate
2    copy of the report you issued to Mr. Carlson in
3    letter format on October 12, 2008?
4    A.    Yes, sir.
5    Q.    And it contains a listing of everything
6    you reviewed in this case?
7    A.    Up to that point. I subsequently have
8    looked at the deposition of Dr. Evans.
9    Q.    Anything else since then?
10   MR. CARLSON: He was also given the report of
11   Dr. Factor and Dr. Kaplan. Evans, Factor, Kaplan,
12   pathology, yes, that's it.
13   BY MR. AUCIELLO:
14   Q.    Other than this list and then the expert
15   reports from the defense experts and the deposition
16   of Dr. Evans, is there anything else you have
17   reviewed?
18   A.    No, sir.
19   Q.    Did you issue any other reports other
20   than this one on October 12, 2008?
21   A.    No, sir.
22   Q.    Did you speak with anyone other than
23   Mr. Carlson or Mr. Carlson's office concerning this
24   case?

---



**ESQUIRE**
an Alexander Gallo Company

Exhibit 21

Toll Free: 888.486.4044
Telephone: 954.622.1092

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

| 45 | 47 |
|---|---|
| 1  A.  No, sir. | 1  gave that to me for background information. |
| 2  Q.  On the second page, you make mention of | 2  Q.  This stack of materials includes the |
| 3  a known product defect in the 75-microgram fentanyl | 3  Anderson and Muto study, two copies of it, |
| 4  packages, you called them? | 4  actually, copies of Duragesic packaging.  This is |
| 5  A.  Yes. | 5  from the Janis DiCosolo case? |
| 6  Q.  What was the known defect with the | 6  A.  Yes, sir. |
| 7  75-microgram patches in April 2005? | 7  Q.  These are copies of the packaging which |
| 8  A.  Those were in the information that was | 8  she had? |
| 9  provided me in the DiCosolo case that talked about | 9  A.  Yes. |
| 10  the product recalls, and the leaking of the drug | 10  Q.  You have got printouts of news reports |
| 11  patches that gave excessive drug levels with some | 11  regarding a recall from Janssen in February 16th, |
| 12  deaths.  And, obviously, the DiCosolo case was such | 12  2004? |
| 13  a death.  And it talked about the product recalls | 13  A.  If that's when it was, yes. |
| 14  and the lot numbers, et cetera. | 14  Q.  What does the recall on February 16, |
| 15  Q.  Is it your opinion that Mr. Adams used a | 15  2004 have to do with this case in April of 2005? |
| 16  recalled patch? | 16  A.  Well, number one is -- well, you have |
| 17  A.  I don't know. | 17  got to work backwards, okay, and working backwards |
| 18  Q.  Is it your opinion that there was a | 18  really, literally, goes from the generation of the |
| 19  product defect in 2005 that caused leaky patches? | 19  toxicology to the fact that he died, to the factors |
| 20  A.  I don't know in terms of when these were | 20  that go into the reasons why he died, the timing of |
| 21  done.  Mr. Carlson told me this morning that there | 21  when he died, the value of the fentanyl that was |
| 22  was a subsequent recall, I think he said in 2006 or | 22  there, the fact that a couple years before that |
| 23  2008, again, with the same product difficulties | 23  there were problems. |
| 24  about leaking patches.  So it apparently has been | 24  I just found out today that subsequent |

| 46 | 48 |
|---|---|
| 1  an ongoing problem.  Having said that, all I can | 1  there were problems, and so that the idea being |
| 2  say is that there is clearly a history, an ongoing | 2  that, (a), the package that he may have taken, |
| 3  history with this product, delivery system. | 3  either the first or the second patch, or both, was |
| 4  Q.  What was the known product defect that | 4  defective.  And it may have just been a defective |
| 5  Mr. Adams would have experienced in April of 2005? | 5  one in a lot that might otherwise have passed |
| 6  A.  Excessive, I don't want to say | 6  quality control.  And Mr. Carlson was telling me |
| 7  "leakage," but excessive output of the fentanyl | 7  about how the manufacturing company would quality |
| 8  from this delivery system, such that it gave more | 8  test these things.  And I am, certainly, not an |
| 9  than the expected dose delivery timing. | 9  expert in critiquing their methodology, but it was |
| 10  Q.  And your basis for that? | 10  just the idea that this has, apparently, been a |
| 11  A.  That what, he had -- | 11  problem over the years. |
| 12  Q.  That opinion. | 12  And that once one determines the cause |
| 13  A.  Basically, the levels that he was given, | 13  of death here, and once one eliminates other |
| 14  (a), he died, and (b), the level that was generated | 14  possible causes of death, then one has to look at |
| 15  at the time of his death, which was clearly at | 15  the fentanyl, look at a value, which clearly was at |
| 16  variance with what the product manufacturer said | 16  variance with what it should have been, and have to |
| 17  would be the product range of therapeutic delivery. | 17  reach the conclusion that one or both of the |
| 18  Q.  Other than the drug level, which you | 18  patches that Mr. Adams took were defective. |
| 19  have talked about, what other evidence do you have | 19  That doesn't necessarily mean -- and we |
| 20  about the known product defect in 2005 that caused | 20  don't have the lot number from which this came |
| 21  excessive output for the delivery system? | 21  from.  But even if the lot number was not one that |
| 22  A.  Only what was given from the Cushing law | 22  was ever recalled, and may have been sitting on the |
| 23  firm to me.  I didn't do any independent | 23  shelf for a year or so even after the recall, but |
| 24  investigation beyond what was there.  They just | 24  even if it was not, it doesn't guarantee that there |



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044
Telephone: 954.622.1092

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

Exhibit 21

Michael Wolfson Kaufman, M.D.
February 13, 2009

---

**49**

1  wasn't defectiveness in one or both of the patches
2  that he took.
3      Q.   My question was, what does the
4  February 16, 2004 recall have to do with this case
5  which occurred in April of 2005.
6      A.   That's what I am telling you, that, for
7  one, because there were recalls, it was initially
8  one lot and then they expanded it to three or four
9  other lots.
10     We don't know for sure that the pharmacy
11  where he took it from had returned all of those
12  lots. We don't know whether --
13     Q.   Is it your testimony that CVS sold
14  Mr. Adams a recalled patch after the date of the
15  recall?
16     A.   No, that's not my testimony.
17     Q.   You were testifying just now that you
18  thought that was a possibility.
19     A.   It is a possibility, but testifying is,
20  in my mind, within a reasonable degree of
21  certainty. It is more probably true than not.
22  I am not saying that. I am saying it's a
23  possibility.
24     Q.   Using that standard, more likely than

---

**50**

1  not, with reasonable scientific certainty, what was
2  the defect in the patch that Mr. Adams used, if
3  any?
4      A.   The delivery system, in some fashion,
5  delivered drug at a rate that was higher than it
6  should have, through either some manufacturing
7  defect or product design defect. I don't know.
8  I am not into the engineering of this thing. But
9  for some reason, certain ones of these were
10  defective causing death of people and overdose of
11  people, such that this has been reported, which is
12  why they were recalled.
13     All I am suggesting is that it is
14  possible in view of the way the quality control was
15  working, even in lots that may have been passed
16  that there weren't necessarily -- or, you couldn't
17  exclude that they were defective.
18     Q.   What was the defect that occasioned the
19  2004 recall?
20     A.   My understanding was these were
21  delivering an amount of drug in a more rapid
22  fashion than they should, causing blood levels to
23  be higher than the levels it should be in a
24  distribution from the patch at a lower level that

---

**51**

1  would give the steady state level that it should
2  be.
3      Q.   Where did you get that information?
4      A.   Those would be from the product recalls,
5  of what it was supposed to do, or the product
6  literature about what its purpose is.
7      Q.   Are you going to present yourself as an
8  expert in the design of transdermal products such
9  as Duragesic patches?
10     A.   No, I am not.
11     Q.   Are you going to state to the jury at
12  the time of the trial that there was a defect in a
13  Duragesic patch used by James Adams?
14     A.   Yes.
15     Q.   The basis of that would be the drug
16  level in his system and the 2004 recall?
17     A.   No, I am just saying that, historically,
18  there were problems in the past with this drug,
19  with this particular level, 75-milligram level.
20  This is a history of that particular drug.
21     Q.   Are you concluding because of the 2004
22  recall that there must have been a defect in the
23  2005 patch, is that fair?
24     A.   And in subsequent recalls, too, also

---

**52**

1  would give evidence that there is, for whatever
2  reason, some product design flaw or some
3  manufacturing flaw. I am not here as an expert.
4  I am just here as a pathologist, putting all the
5  pieces of information together.
6      We have somebody who died, and you have
7  to decide, as a pathologist, why did he die and why
8  did he die 96 hours after he starts this
9  medication. Why does he die the day after the
10  second patch is put on, when other things were all
11  steady state?
12     All of the other multiple drugs he was
13  on in therapeutic levels were done in steady state.
14     The heart disease, in my mind, was a
15  steady state, certainly, over the several months it
16  was going on and, certainly, during the several
17  months since his accident with getting hit by the
18  cow, all of these things were steady states.
19     So the only new thing that happened to
20  this guy was that he started on the fentanyl patch.
21  And, literally, the day after he gets the second
22  patch put on, he is found dead, and with a level
23  that, clearly, was multiples higher than anything
24  that the product manufacturer would have determined

---



# ESQUIRE
*an Alexander Gallo Company*

Exhibit 21

Toll Free: 888.486.4044
Telephone: 954.622.1092

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

---

53

1  to be the appropriate drug level.
2       And so me, as pathologist, says, "What,
3  given all these factors, what is the most likely
4  event here?" And, to me, this is the most likely
5  event.
6       Q.   This is, what, a defect, that you can't
7  tell me what it is?
8       A.   No, that he died of a toxic level of
9  fentanyl on his body.
10       Now, how it happened is in some fashion
11  the drug was, essentially -- the output of that
12  patch was greater than it should have been. These
13  patches are supposed to last 72 hours. And in some
14  fashion, the drug, either the first go-around and
15  then the second go-around, or just all together in
16  some fashion reached a level that in combination
17  with the other drugs he was on, basically, caused
18  his death at that particular point in time.
19       Q.   My question is still, when you wrote
20  your report, before you knew about subsequent
21  recalls and talked to Mr. Carlson this morning,
22  when you wrote your report about the known product
23  defect on Page 2, you were referring to the 2004
24  recall, correct?

---

54

1       A.   Yes.
2       Q.   You don't know what the defect was that
3  specifically caused the 2004 recall, do you?
4       A.   That's not true. They talk about that
5  in the product recall in terms of the way these
6  patches are working, that they are leaking. And in
7  some fashion that they were leaking, or they were
8  getting to the skin surface to be absorbed in a
9  greater rate than they should have, causing the
10  levels.
11       Q.   Are you giving opinions as to whether
12  gel on the skin would be absorbed at a faster rate
13  than inside the patch?
14       A.   I don't know the mechanism of how it
15  happened. All I know is it happened. It,
16  certainly, happened in the DiCosolo case, and in my
17  impression it happened here.
18       I am not suggesting that, or not
19  testifying that CVS was selling stuff that they
20  knowingly knew was supposed to be recalled, and
21  they sold it, anyway.
22       I am just suggesting, in some fashion,
23  one or both of the patches that Mr. Adams took were
24  defective.

---

55

1       Q.   For the same reason that the 2004
2  patches were defective?
3       A.   Yes. It may have been a different
4  reason why they were going at an increased amount.
5  They may have fixed one problem. There may have
6  been another problem. I don't know. I am not into
7  the manufacture.
8       Q.   You are the expert who wrote the report
9  saying there was a known product defect that caused
10  Mr. Adams to die.
11       I want, out of this deposition, I need
12  to know what that known product defect was that you
13  believe occurred in April of 2005 that caused
14  Mr. Adams to die, to the greatest specificity you
15  can give me.
16       MR. CARLSON: I object as asked and answered.
17  Go ahead.
18  BY THE WITNESS:
19       A.   In some fashion, the product was
20  defective in that it delivered a level of drug in
21  an amount more than it should have, such that the
22  circulating blood level and its physiologic effect
23  became toxic and, ultimately, fatal.
24  BY MR. AUCIELLO:

---

56

1       Q.   Did you see the patch that was worn by
2  Mr. Adams?
3       A.   No, I did not.
4       Q.   Did Dr. Jacobi see the patch that was
5  worn by Mr. Adams?
6       A.   Yes, he did. He threw it out.
7       Q.   Did he observe or note a defect in the
8  patch?
9       A.   I don't think he would know whether one
10  existed or not.
11       Q.   Did he observe or note a defect in the
12  patch?
13       A.   That implies that it was something that
14  could be observed and noted, and so the question is
15  unanswerable, because it implies that such a defect
16  would be noticed.
17       Q.   Is it your testimony that the defect
18  that caused the 2004 recall would not be noticed?
19       A.   I don't know. I don't know in terms of
20  the people who had the problems whether they
21  noticed anything different. Some of them were,
22  clearly, during the process of manufacturing, or in
23  there they talked about that the gel, or whatever,
24  was actually leaking out of the patches before they

---



ESQUIRE
an Alexander Gallo Company

Exhibit 21

Toll Free: 888.486.4044
Telephone: 954.622.1092

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

Michael Wolfson Kaufman, M.D.                                February 13, 2009

---

57

1  even got them on there. But other ones,
2  apparently, not.
3      Q.    Back to my original question. Did
4  Dr. Jacobi observe or note any defect in the patch?
5      A.    None that he stated, but, again, that
6  question presupposes that such a defect would be
7  observed or noted, and I don't think that that is a
8  fair question.
9      Q.    Dr. Jacobi did not note a defect in the
10  patch in his written report, correct?
11     A.    If you have a circumstance where a
12  defect is not noted, how could he note something
13  that you would not necessarily know?
14     Q.    Dr. Jacobi did not note a defect in the
15  patch in his written report, is that correct?
16     A.    That's correct.
17     Q.    In his deposition, did he give any
18  indication that he observed anything unusual about
19  the patch that he removed from Mr. Adams' body?
20     A.    No, he did not.
21     Q.    Did you read Mrs. Adams' testimony?
22     A.    Yes.
23     Q.    Did you find in that deposition any
24  evidence that Mr. or Mrs. Adams observed any

---

59

1  level of fentanyl was, you know --
2      Q.    What was the recommended dose for
3  Duragesic for Mr. Adams to be placed on?
4      A.    My understanding was he prescribed the
5  75-milligram patch to be replaced every 72 hours.
6      Q.    That's what he was prescribed. What was
7  the manufacturer's recommendation for the dosage he
8  should have received?
9      A.    I don't know.
10     Q.    Did you read Dr. Grimm's deposition?
11     A.    Yes.
12     Q.    Isn't it true that Mr. Adams was on
13  60 milligrams of Avinza when he was first
14  prescribed Duragesic?
15     A.    I know he was on the drug, but I don't
16  know what the drug level was.
17     Q.    If he was, in fact, on 60 milligrams of
18  Avinza, are you familiar with the product insert
19  for the Duragesic patch?
20     A.    Only to the extent that it was given to
21  me.
22     Q.    I don't think I see it there.
23     A.    Sorry, this is the PDR.
24     Q.    I will rephrase the question. Did you

---

58

1  leaking from any patch that was used by Mr. Adams?
2      A.    No.
3      Q.    Are you familiar with the Food & Drug
4  Administration?
5      A.    I am not sure what you mean by
6  "familiar." I know it exists.
7      Q.    As it relates to the 2004 product recall
8  that you referenced earlier.
9      A.    If they were the ones who called the
10  recall or told the manufacturer to do the product
11  recall, I don't know how it got to that point.
12     Q.    Do you know what a Class II recall is?
13     A.    No.
14     Q.    Going back to your report, you do not
15  agree that it was a cardiac arrythmia caused by
16  atherosclerosis that caused Mr. Adams' death?
17     A.    Correct.
18     Q.    You believe it was fentanyl toxicity?
19     A.    Yes, in conjunction with the other drugs
20  that he was on, but that was the proverbial straw.
21  In other words, he was on other narcotics, although
22  in therapeutic range.
23         I can't eliminate the possibility that
24  in conjunction with these drugs that the toxic

---

60

1  make any investigation to determine whether the
2  dosage given to Mr. Adams was appropriate under the
3  circumstances?
4      A.    I have no opinions about that.
5      Q.    Why do you have no opinions on that?
6      A.    Because that's standard of care on the
7  part of the clinician in terms of what clinical
8  judgments they used to do their prescriptions. And
9  so I would have no opinions about the
10  appropriateness or inappropriateness of any drugs
11  that were prescribed.
12     Q.    And it is not of concern to you the
13  amount of Duragesic being prescribed in the fashion
14  as recommended? All you care about was the
15  75-microgram patch?
16     A.    No, what I am saying is that if one
17  wants to make argument that this was poly-drug
18  abuse and the fentanyl was the final straw,
19  I don't have a problem with that.
20         But the issue is, that is a standard of
21  care question, did Dr. Grimm adhere or not adhere
22  to the standard of care. I don't have any opinions
23  about that.
24     Q.    I am not interested in that. I am just

---



Toll Free: 888.486.4044
Telephone: 954.622.1092

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

ESQUIRE
an Alexander Gallo Company

Exhibit 21

61

1  interested whether he followed the manufacturer's
2  dosing instructions in the package inserts, whether
3  or not it violates the standard of care.
4      A.  I don't know.
5      Q.  It would not be something of concern to
6  you in your role here?
7      A.  No, it would not.
8      Q.  Would you agree with me that fentanyl
9  does not cause cardiac arrythmia?
10     A.  I would agree.
11     Q.  Fentanyl does not cause atherosclerosis?
12     A.  I agree.
13     Q.  What was the height and weight of
14 Mr. Adams when he died?
15     A.  He weighed 200 -- at least, in the
16 autopsy report, 250 pounds, and I don't know
17 whether that was an estimate, and his height was
18 5' 10".
19     Q.  Did he have a history of heart disease
20 in his family?
21     A.  I have to look at my notes.  I don't,
22 specifically, recall one way or the other.
23     Q.  He was also found to have what
24 Dr. Jacobi described as a fatty liver, is that

63

1      Q.  Mr. Adams sought no medical attention
2  throughout most of his life until he had his back
3  injury, correct?
4      A.  I don't recall.
5      Q.  You didn't have a history of liver
6  enzyme levels or treatment and care relating to his
7  liver, correct?
8      A.  That would probably be correct.
9      Q.  What would cause a fatty liver?
10     A.  There are many causes.  It could be
11 obesity, in and of itself.  It could be
12 steatohepatitis.  Diabetes can cause it.  People
13 who have gastric bypass surgeries.  People who are
14 malnourished may have fatty livers.  People who are
15 alcoholic may have fatty livers.  Those are major
16 reasons.
17     Q.  Mr. Adams was, what, 37 years old?
18     A.  I thought he was 48.
19     Q.  Sorry.  I am looking at your years of
20 experience.  How old was Mr. Adams?
21     A.  I think he was 48.
22     Q.  Is it unusual for a 48-year-old man to
23 have a fatty liver?
24     A.  No, it depends on the circumstance.  If

62

1  correct?
2      A.  Yes.
3      Q.  Does fatty liver mean something to you
4  as a pathologist?
5      A.  Yes.
6      Q.  That's a term of art?
7      A.  Yes.
8      Q.  Can liver dysfunction cause drug levels
9  in blood to be higher than normal?
10     A.  Well, depends on what you define as
11 "function."  I did not believe his fatty lever
12 caused his liver to dysfunction, as far as what a
13 liver does, in terms of metabolism, in terms of
14 making blood clotting products, in terms of
15 secreting bilirubin.
16     Q.  That wasn't my question.
17     A.  I understand.  Your question is,
18 theoretically, if you are cirrhotic and have liver
19 insufficiency, yes, it could effect drug levels.
20     Q.  You put in your report there is no
21 indication that Mr. Adams' liver was not
22 functioning at -- I am assuming you mean "at normal
23 levels at the time his death"?
24     A.  That's correct.

64

1  he was obese and 250, it is getting up there.  If
2  he was diabetic or prediabetic, that wouldn't
3  surprise me.
4      Q.  Do you know whether he was diabetic?
5      A.  No, I do not know.  I have no indication
6  he was, so that that's out there.  He may have
7  non-alcoholic steatohepatitis.
8      Q.  Do you know what caused Mr. Adams to
9  have a fatty liver?
10     A.  No, I don't.
11     Q.  From his wive's deposition, you don't
12 know whether he had consumed alcohol, other
13 narcotics, had any other health condition that
14 would cause the fatty liver?
15     A.  Narcotics wouldn't do it, but I don't
16 know what his alcohol intake was.
17     Q.  I take it, 250 pounds, you would
18 consider him obese?
19     A.  I didn't do his BMI.
20     Q.  5' 10", 250, isn't obese?
21     A.  No, it is.  I am up there, too, but I am
22 also 6' 3-1/2".  He was on the large side, shall we
23 say.
24     Q.  Last page of your report, sir, you



Toll Free: 888.486.4044
Telephone: 954.622.1092

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

Exhibit 21

Michael Wolfson Kaufman, M.D.                                    February 13, 2009

---

65

1    indicate that the steady state fentanyl levels
2    should be 1.7, plus or minus .7?
3        A.   Correct.
4        Q.   Is that one standard deviation?
5        A.   I would probably think that was, at
6    least, one. It may be three. Generally, when they
7    do standard deviations, something like this, it is
8    probably three, which would be 95 percent of the
9    people.
10       Q.   So three standard deviations would get
11   you to 95 percent of the people?
12       A.   One standard deviation is two-thirds.
13   Two standard deviations, I think, is 95 percent,
14   three, I think, is, like, 99 percent. Basically,
15   this was from the product manufacturer's package
16   insert.
17       Q.   So if one standard deviation were .7,
18   that would take it to 2.4, correct?
19       A.   No, it doesn't work that way. Oh, in
20   terms if it was one standard deviation, but
21   I suspect it probably was more than one standard
22   deviation.
23       Q.   Assume for me .7 is one standard
24   deviation. With three standard deviations at .7,

---

66

1    what would that take the level to?
2        A.   It may only be another point. It is
3    difficult to know, because it is a bell-shaped
4    curve. And so the remaining third, only one-sixth
5    of the people would be higher than that if it was
6    just one standard deviation, but I suspect it is
7    probably two or three.
8        Q.   Are you familiar with any studies
9    measuring the amount of fentanyl in people's blood
10   while using Duragesic patches?
11       A.   I think this is results of the studies.
12   In other words, the product manufacturer's package
13   insert states that this is what the values should
14   be.
15       Q.   Other than the information in the
16   package insert, are you familiar with the blood
17   levels of people using Duragesic patches?
18       A.   No, we talked about that, again, in
19   antemortem blood studies that were done. So,
20   clearly, these would have been presented prior to
21   the patch's acceptance by the FDA as approved.
22       Q.   When was the patch approved by the FDA?
23       A.   I don't know.
24       Q.   You indicate the blood was drawn from

---

67

1    the superior vena cava, correct?
2        A.   Correct.
3        Q.   That's not an error in your report?
4        A.   Well, it was from -- clearly, whether it
5    was from the jugular vein or from the subclavian
6    vein, it was in the neck. And so the lowest thing
7    in the neck is the superior vena cava.
8            So whether it was a needle insert or
9    whether he was just, sort of, taking blood as he
10   was opening up the neck, my impression was that's
11   what he said. But, clearly, the idea being that it
12   was not an injection extraction from either the
13   right atrium or the right ventricle or the inferior
14   vena cava.
15       Q.   Let's go down to the next paragraph.
16   You believe that Dr. Jacobi was wrong in concluding
17   that cardiac ischemia leads to arrhythmia causing
18   death?
19           MR. CARLSON: Where does Dr. Jacobi say that?
20   BY THE WITNESS:
21       A.   It says, "I do not believe that his
22   death was due to any cardiac ischemia," implying it
23   was from coronary artery disease.
24   BY MR. AUCIELLO:

---

68

1        Q.   You are saying that Dr. Jacobi was wrong
2    in blaming the death on coronary artery disease?
3        A.   I don't like the word "wrong." I just
4    say I have a different opinion. In my opinion, he
5    was in error, but I don't like the word "wrong."
6        Q.   I will change my question.
7        A.   We disagree in terms of our conclusions.
8        Q.   Is this an area where reasonable
9    pathologists can disagree?
10       A.   Yes, I think that would be an area, if
11   it was based on the full information that
12   Dr. Jacobi did not have. The full information
13   being that he discounted the fentanyl, because he
14   thought that this was a chronic usage, and so,
15   therefore, drug levels could be higher without any
16   respiratory depressed effect.
17       Q.   Did you read his deposition?
18       A.   Yes, I did.
19       Q.   Did he back down from any of his
20   opinions in his deposition?
21       A.   The things I disagreed with in his dep,
22   if you want to talk about that, or just what he
23   backed down on?
24       Q.   Did he change his mind? He was

---



ESQUIRE
an Alexander Gallo Company

Exhibit 21

Toll Free: 888.486.4044
Telephone: 954.622.1092

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

69

1  presented with facts when he was deposed, and he
2  didn't change his opinion as to the cause of death
3  in this case, did he?
4       A.   Well, yes, he did.  He said he backed
5  off on it being a toxic level, because he said he
6  was a, quote, "chronic user."  That was on Page 29.
7       Q.   That would be another thing that you
8  think he is in error on, because in his report he
9  said it was a toxic level.
10           In his deposition, he gave less emphasis
11  to that level --
12       A.   That's correct.
13       Q.   -- in determining the cause of death?
14       A.   Correct.
15       Q.   You disagree with that?
16       A.   Disagree with what?
17       Q.   Him giving less emphasis to the toxic
18  level in determining cause of death?
19       A.   Yes, I do.
20       Q.   You also disagreed with his
21  interpretation of what the fatty liver would do to
22  Mr. Adams' drug metabolism?
23       A.   He says that he admits that if his liver
24  was bad, that the fentanyl would have had a greater

70

1  effect.
2           And I am saying that his liver was not
3  bad to that extent.  In other words, he has all the
4  other drugs that he has taken.  None of those were
5  in toxic levels.
6           If the liver had problems metabolizing
7  drugs, all of those levels should have been greater
8  than therapeutic levels, yet none of them were.
9  So, in fact, some of them were subtherapeutic.
10           So to suggest that it was only the
11  fentanyl that was elevated, I think, does not make
12  any physiologic sense.
13       Q.   What enzymes metabolize fentanyl?
14       A.   I don't know.
15       Q.   Do you know the different enzymes that
16  would metabolize the other drugs he was taking?
17       A.   No, but the idea being a liver cell
18  functions with all its enzymes or not because it is
19  dead, or because suboptimally working across the
20  board.  It doesn't selectively choose to be unable
21  to metabolize one drug versus another.
22       Q.   This is another area where you believe
23  Dr. Jacobi, who actually saw and touched and
24  examined the liver, is in error, and you having

71

1  looked over this case, three years later, is
2  correct?
3       A.   Yes, for the reasons which I have said,
4  that he was not comparing the fact that every other
5  drug was in therapeutic or subtherapeutic range and
6  the fentanyl was not.
7       Q.   Also on Page 3 of your report you make
8  reference to improperly manufactured product.
9           I take it by putting it in your report
10  that you would consider yourself an expert in the
11  manufacture of Duragesic patches or fentanyl
12  products?
13       A.   No.
14       Q.   Can you tell me what manufacturing
15  deficiencies existed in 2005 that would have caused
16  a defect that caused Mr. Adams to die if Dr. Jacobi
17  was wrong?
18       A.   I don't know the specific defect, except
19  the generic concept that whatever happened caused
20  the release of the drug in a higher/faster rate
21  than what was intended.  And whether it was the
22  same defect in 2005 which existed in 2004, I don't
23  know.
24       Q.   Let's move on to Dr. Factor's report.

72

1  Did you review Dr. Factor's report?
2       A.   Yes, I did.
3       Q.   You disagree with his conclusions?
4       A.   Yes, I do.
5       Q.   He stated that Mr. Adams had high-grade
6  subtotally occlusive disease of the LCX at multiple
7  levels with narrowing of the vessel to 80 percent.
8           Do you recall him making that statement
9  in Page 3 of his report?
10       A.   Yes, I do.
11       Q.   Do you agree with that statement?
12       A.   No, I don't.
13       Q.   Why not?
14       A.   First of all, the person who was there
15  was Dr. Jacobi, and what he writes is that the
16  proximal third of the circumflex artery features
17  70 percent occlusion by plaque.
18           He states no luminal thrombi or plaque
19  hemorrhages are noted.  The remainder of the
20  circumflex artery, which is the distal two-thirds,
21  displays only trace atherosclerotic plaque.
22           So that's what the person who was there
23  stated, and I accept that as being accurate.
24           He takes three cross-sections of an



ESQUIRE
an Alexander Gallo Company

Exhibit 21

Toll Free: 888.486.4044
Telephone: 954.622.1092

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

Michael Wolfson Kaufman, M.D.                    February 13, 2009

---

73

1    artery, which I assume were all from the left
2    circumflex artery, and I agreed with Dr. Jacobi
3    that the maximum this was, was about a 70-percent
4    area of narrowing.
5        Q.   You now agree with me that Dr. Jacobi is
6    in a better position to determine cause of death
7    having done the autopsy than either you or
8    Dr. Factor?
9        A.   No, I already went through that with you
10   that I disagreed with that.  And, in fact, I think
11   I have more information than Dr. Jacobi did when he
12   did this report.
13       Q.   All right.  Dr. Factor also found acute
14   unstable plaque with plaque hemorrhage and
15   microthrombus in the lumen adhering to the vessel
16   wall.
17       A.   That's what he states, and I disagree
18   with him.
19       Q.   Why?
20       A.   Number one, Dr. Jacobi, who was there,
21   who grossly didn't see anything, who
22   microscopically didn't see anything, made the
23   slides.  I looked at it.  I didn't grossly see
24   anything from the slides.  I didn't see

---

74

1    microscopically anything.  I have pictures.  And if
2    you see anything in these pictures that show any
3    intraplaque hemorrhage or any intraluminal
4    thrombus, then feel free to show me.
5        Q.   Is it true that you are not a specialist
6    in cardiac pathology?
7        A.   That's not true.  There is no such thing
8    as a specialist in the sense that there is no board
9    certification to call yourself a specialist.
10       Am I not a specialist -- do I not have
11   specialization in forensic pathology because I
12   don't have boards?
13       There aren't even any boards in cardiac
14   pathology.  Do I have experience?  Do I have
15   expertise in cardiac pathology?  I do.  And you
16   could show the slide to anybody, grossly or
17   microscopically, to Dr. Jacobi, to myself, and
18   through the pictures, nobody is going to see an
19   intraplaque hemorrhage.  Nobody is going to see an
20   intraluminal thrombus in that vessel.
21       Q.   You do not specialize in cardiac
22   pathology, is that correct?
23       A.   That's correct.
24       Q.   To your knowledge, Dr. Jacobi doesn't

---

75

1    specialize in cardiac pathology, correct?
2        A.   That's correct, but that doesn't mean
3    just because you specialize in something -- you are
4    right.  The greatest hitter in baseball made out
5    70 percent of the time.  So that doesn't mean that
6    you are still not the greatest hitter in baseball.
7        Q.   He further found multiple focal acute
8    myocardial necrosis focally extending -- I won't
9    read it all, because it just makes the transcript
10   difficult to read.
11       Do you disagree with that, as well?
12       A.   First of all, I would like to look at
13   these slides, again.  I didn't see anything
14   originally.  Dr. Jacobi didn't see anything
15   originally.
16       If you were arguing that Dr. Jacobi was
17   in a much better position than me to come up to his
18   conclusions, he certainly didn't conclude that.
19       Q.   Based on your initial review of the
20   slides, you disagree with this?
21       A.   Yes, that's correct.
22       Q.   No. 4, he said one area of the
23   myocardium with necrosis that was four to six hours
24   in duration associated with PMNs extending into the

---

76

1    interstitial space.
2        I can't remember what that stands for.
3    Do you agree with it?
4        A.   No, I disagree.
5        Q.   Because that's something you did not see
6    when you --
7        A.   Originally looked at it, correct.
8        Q.   No. 5, it says a minute focus of
9    myocardial necrosis that was several days old.
10   Did you see that?
11       A.   No, I didn't see anything of the things
12   he said.  The only thing that I saw, that
13   Dr. Jacobi saw, was the coronary arteries.
14       And I said, as Dr. Jacobi did, that was
15   about 70 percent grossly and microscopically.
16       I also made some other statements about
17   why I felt that that was a non-factor in this case,
18   that Dr. Jacobi maybe disagreed with me.  But
19   neither Dr. Jacobi, who you allege is the person in
20   the best position to come up with an impression
21   here, agreed with me, or I agreed with him.
22       Q.   But it is your opinion that you are in a
23   better position than Dr. Jacobi, and Dr. Factor is
24   in a better position than Dr. Jacobi?

---



**ESQUIRE**
an Alexander Gallo Company

Toll Free: 888.486.4044
Telephone: 954.622.1092

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

Exhibit 21

77

1      A.   I don't know if Dr. Factor availed
2   himself of all the information that I did. I don't
3   know if he reviewed everything I reviewed.
4      Q.   Have you reviewed any other fentanyl
5   patch cases other than this one and the DiCosolo
6   case?
7      A.   No, I have not.
8      MR. AUCIELLO:   Let's take a short break. I am
9   just about done.
10  BY THE WITNESS:
11     A.   Do you want me to look at the slides?
12  BY MR. AUCIELLO:
13     Q.   You looked at them once already. I
14  don't think it is a useful time. You reviewed it
15  once.
16     A.   I would like --
17     Q.   If you review them again and find
18  something different, then you can supplement that.
19     A.   It wouldn't change my opinions.
20     MR. AUCIELLO:   Let me look at my notes just to
21  make sure I am done.
22     Let's mark them and call this Exhibit 4.
23     (WHEREUPON, photographs were marked
24     Kaufman Deposition Group Exhibit

78

1      No. 4, for identification, as of
2      2/13/09.)
3   BY MR. AUCIELLO:
4      Q.   Doctor, you took photographs when you
5   examined the slides in this case?
6      A.   I took photographs when I examined the
7   slides, yes.
8      Q.   I have marked them as Exhibit 4, and the
9   sub-exhibit photographs are numbered 426 through
10  445 on the back of Exhibit 4.
11     Just showing you those and ask you if
12  those are true and accurate copies of the
13  photographs you took during your examination of the
14  slides in this case?
15     A.   Yes. I only took pictures of the liver
16  and the coronary artery, but, yes.
17     Q.   And that's what is contained in
18  Exhibit 4. Okay.
19     Did you review Dr. Yale Kaplan's report?
20     A.   Yes, I did.
21     Q.   Do you know who Yale Kaplan is?
22     A.   No, I don't.
23     Q.   Do you disagree with his conclusions?
24     A.   I don't recall what his conclusions are.

79

1      Q.   He is a forensic toxicologist.
2      A.   That doesn't answer -- that was a
3   nonresponsive answer.
4      Well, I disagree with his first
5   conclusion. Second conclusion, I disagree with.
6   Third, I disagree to the extent that it contributed
7   to the cardiac events. It may have contributed to
8   respiratory events, as I stated in my opinion
9   report, so I disagree with his third.
10     I, basically, disagree with his
11  conclusions.
12     Q.   And he has some references. Are you
13  familiar with the writings by Graham Jones on
14  postmortem redistribution?
15     A.   I have the Karch book. If I read it at
16  some point in the past, I did.
17     Q.   Are you familiar with the writings of
18  Dr. Karch himself?
19     A.   No, just his book. Just his book.
20  I assume he writes -- he wrote his book.
21     Q.   A lot of times a lot of the articles are
22  not written by the author.
23     A.   I would have to reference his book.
24     Q.   Is that one he wrote himself, or is that

80

1   one that he solicited chapters from other people?
2      A.   I think he wrote it. This is the latest
3   edition. I just got this.
4      Q.   Would you consider Dr. Karch to be an
5   authority in his field?
6      A.   I think he is well-respected.
7      Q.   Could I see that for a second?
8      A.   This is the 4th edition, and it is dated
9   2009. Just came out.
10     Q.   Couple of things I wanted to ask you
11  about I thought he might have written, but I
12  couldn't remember.
13     Doctor, we are looking at your brand new
14  edition of Karch's Pathology of Drug Abuse,
15  4th Edition.
16     In that book, at Page 452, under the
17  category Autopsy Findings, Dr. Karch indicates that
18  if, I think, he means illicit, but "if transdermal
19  patches are present, nothing prevents the
20  continuous release of fentanyl after death."
21     A.   Into the skin, that's correct.
22     Q.   He then concludes, "In such cases, and
23  in instances where multiple patches had been
24  applied, postmortem concentrations may be well over



Toll Free: 888.486.4044
Telephone: 954.622.1092

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

Exhibit 21

Michael Wolfson Kaufman, M.D.                    February 13, 2009

**81**

1  50 nanograms per milliliter."
2    A.   I don't know about that. There was only
3  one patch, number one.
4         Number two is, the problem comes at
5  death, the circulation stops. And so I don't see
6  how that circumstance could even apply in this
7  case. Particularly, when the patch was removed in
8  short order after death. His autopsy was pretty
9  quick after death, so regardless of whatever he is
10  saying.
11         The other issue, too, is unless you took
12  serial values, how would you even know that that's
13  the case. One of the articles here talked about
14  abusing fentanyl, where people would put multiple
15  patches on to get the high from it, to get levels
16  like that that were that high, but we are not
17  talking about that here.
18    Q.   If Dr. Karch wrote, "If absorption from
19  the patch continues after death and there is no
20  reason to assume that the patch will stop releasing
21  fentanyl at the time of death, high fentanyl
22  concentrations observed at autopsy might mistakenly
23  be considered the cause of death," you disagree
24  with that?

**82**

1    A.   I would have to see basis of his
2  opinion, but regardless of whatever his opinion is,
3  in this particular case, I disagree with it.
4    Q.   Have you seen any other writings of
5  Dr. Karch where he makes blanket statements about
6  the unreliability of postmortem drug levels?
7    A.   No.
8  MR. AUCIELLO: I have no further questions.
9  Thank you, Doctor.
10  MR. CARLSON: I don't have any questions.
11  THE WITNESS: Reserve signature.
12         FURTHER DEPONENT SAITH NOT.

**83**

1         IN THE UNITED STATES DISTRICT COURT
2         SOUTHERN DISTRICT OF ILLINOIS
3
4  LINDA ADAMS, etc.,          )
5         Plaintiffs,   )
6    vs.              )  No. 2007-CV-0497-DGW
7  JOHNSON & JOHNSON, et al.,   )
8         Defendants.  )
9
10         I hereby certify that I have read the
11  foregoing transcript of my deposition given at the
12  time and place aforesaid, consisting of Pages 1 to
13  82, inclusive, and I do again subscribe and make
14  oath that the same is a true, correct and complete
15  transcript of my deposition so given as aforesaid,
16  and includes changes, if any, so made by me.
17
18
19         MICHAEL WOLFSON KAUFMAN
20  SUBSCRIBED AND SWORN TO
21  before me this    day
22  of   , A.D.  2009.
23         Notary Public
24

**84**

1  STATE OF ILLINOIS  )
        ) SS:
2  COUNTY OF C O O K  )
         I, JOANNE H. RICHTER, a Notary Public
3  within and for the County of Cook, State of
  Illinois, and a Certified Shorthand Reporter of
4  said state, do hereby certify:
         That previous to the commencement of the
5  examination of the witness, the witness was duly
  sworn to testify the whole truth concerning the
6  matters herein;
         That the foregoing deposition transcript
7  was reported stenographically by me, was thereafter
  reduced to typewriting under my personal direction
8  and constitutes a true record of the testimony
  given and the proceedings had;
9         That the said deposition was taken
  before me at the time and place specified;
10         That I am not a relative or employee or
  attorney or counsel, nor a relative or employee of
11  such attorney or counsel for any of the parties
  hereto, nor interested directly or indirectly in
12  the outcome of this action.
13         IN WITNESS WHEREOF, I do hereunto set my
14
15  hand and affix my seal of office at Chicago,
16  Illinois, this 23rd day of February, 2009.
17
18
19
20         Notary Public, Cook County, Illinois.
21         Commission expires October 26, 2009.
22
23
24  C.S.R. Certificate No. 84-2082.



# ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044
Telephone: 954.622.1092

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

Exhibit 21

85

1              I N D E X
2   WITNESS                    EXAMINATION
3   MICHAEL WOLFSON KAUFMAN
4      By Mr. Auciello              3
5
6            E X H I B I T S
7
8   NUMBER              MARKED FOR ID
9
10  KAUFMAN DEPOSITION EXHIBIT
11      No. 1              4
12      No. 2              34
13      No. 3              43
14      Group No. 4              77
15
16
17
18
19
20
21
22
23
24

87

1   Deposition of MICHAEL WOLFSON KAUFMAN, M.D.
2
3   Page No._____Line No._____Change to:_____
4   Reason for change:_____
5   Page No._____Line No._____Change to:_____
6   _____
7   Reason for change:_____
8   Page No._____Line No._____Change to:_____
9   _____
10  Reason for change:_____
11  Page No._____Line No._____Change to:_____
12  _____
13  Reason for change:_____
14  Page No._____Line No._____Change to:_____
15  _____
16  Reason for change:_____
17  Page No._____Line No._____Change to:_____
18  _____
19  Reason for change:_____
20
21
22
23  SIGNATURE:_____DATE:_____
24         MICHAEL WOLFSON KAUFMAN, M.D.

86

1          DEPOSITION ERRATA SHEET

2   RE:    ESQUIRE DEPOSITION SOLUTIONS
3   File No. 11566
4   Case Caption:  LINDA ADAMS, ETC.
5   vs. JOHNSON & JOHNSON, ET AL.
6   Deponent:  MICHAEL WOLFSON KAUFMAN, M.D.
7   Deposition Date:  FEBRUARY 13, 2009
8   To the Reporter:
9   I have read the entire transcript of my Deposition taken
10  in the captioned matter or the same has been read to me.
11  I request that the following changes be entered upon the
12  record for the reasons indicated.  I have signed my name to
13  the Errata Sheet and the appropriate Certificate and
14  authorize you to attach both to the original transcript.
15
16  Page No._____Line No._____Change to:_____
17  _____
18  Reason for change:_____
19  Page No._____Line No._____Change to:_____
20  _____
21  Reason for change:_____
22  Page No._____Line No._____Change to:_____
23  _____
24  Reason for change:_____



Toll Free: 888.486.4044
Telephone: 954.622.1092

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

Exhibit 21