## 1

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF ILLINOIS

LINDA ADAMS, etc.,         )
        Plaintiffs,        )
    vs.                    ) No. 2007-CV-0497-DGW
JOHNSON & JOHNSON, et al., )
        Defendants.        )

The deposition of JERROLD B. LEIKIN, M.D., called by the Defendants for examination, taken pursuant to the Federal Rules of Civil Procedure of the United States District Courts pertaining to the taking of depositions, taken before JOANNE H. RICHTER, a Notary Public within and for the County of Cook, State of Illinois, and a Certified Shorthand Reporter of said state, No. 84-2082, at Glenbrook Hospital, Suite 3000, 2150 Pfingsten Road, Glenview, Illinois, on the 13th day of February, A.D. 2009, at 1:00 p.m.

## 2

1  PRESENT:
2
3    LAW OFFICES OF CARLSON & CARLSON, P.C.
4    (90 Edwardsville Professional Park
5    Edwardsville, Illinois  62025
6    618.656.0066
7    ecarlson@mcleodusa.net), by:
8    MR. ERIC J. CARLSON,
9        appeared on behalf of the Plaintiffs;
10
11   TUCKER ELLIS & WEST LLP
12   (1150 Huntington Building
13   925 Euclid Avenue
14   Cleveland, Ohio  44115-1414
15   216.696.4780
16   ernest.auciello@tuckerellis.com), by:
17   MR. ERNEST AUCIELLO, JR.,
18       appeared on behalf of the Defendants.
19
20  REPORTED BY: JOANNE H. RICHTER,
21       C.S.R. No. 84-2082.

## 3

1        (WHEREUPON, the witness was duly
2        sworn.)
3        JERROLD LEIKIN, M.D.,
4   called as a witness herein, having been first duly
5   sworn, was examined and testified as follows:
6            EXAMINATION
7   BY MR. AUCIELLO:
8        Q.   Doctor, would you state your name, for
9   the record, please.
10       A.   Jerrold Leikin L-e-i-k-i-n.
11       Q.   What is your professional address?
12       A.   2150 Pfingsten Road, Suite 3000,
13  Glenview, Illinois, 60026.
14       Q.   Doctor, I know you have given
15  depositions before, so if I ask any question that
16  you don't understand, please be sure to tell me and
17  I will be happy to rephrase it.
18       A.   Yes, sir.
19       Q.   Dr. Leikin, we are here because you have
20  been identified as an expert for the plaintiff in a
21  case called Adams versus Johnson & Johnson pending
22  in the Southern District of Illinois.
23            You are a retained expert in that case?
24       A.   Yes, sir.

## 4

1        Q.   Showing you what I will mark as
2   Exhibit 1, is that a true and accurate copy of the
3   report you issued in the case?
4        A.   Yes, sir.
5            (WHEREUPON, said document was marked
6            Leikin Deposition Exhibit No. 1, for
7            identification, as of 2/13/09.)
8   BY MR. AUCIELLO:
9        Q.   Does that report reflect all of the
10  opinions you intend to give in this matter?
11       A.   I believe so.
12       Q.   I just want to make sure I understand
13  them all.
14            You note that the 12.2 level that
15  Mr. Adams was found to have, postmortem, would not
16  be expected to occur from a 75-microgram patch?
17       A.   Yes, sir.
18       Q.   You also note that you would expect a
19  postmortem level to be 4 nanograms per milliliter?
20       A.   I would expect it to be less than that.
21       Q.   Less than 4?
22       A.   Yes.
23       Q.   And from that, I take it, you are of the
24  opinion that postmortem redistribution would not


ESQUIRE
an Alexander Gallo Company

Exhibit 24

Toll Free: 888.486.4044
Telephone: 954.622.1092

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

### Page 5

1  effect the level in this case?
2      A.  It can effect it. That's possible, yes.
3      Q.  What is your opinion regarding the
4  degree of postmortem redistribution that would have
5  occurred in this case, or that could have occurred
6  in this case?
7      A.  I cannot articulate a specific number,
8  per se. "Degree" implies there is a number, so I
9  cannot articulate a specific number, but I do agree
10 that postmortem redistribution can occur.
11     Q.  In light of postmortem redistribution
12 occurring, are you able to use the 12.2 and so-call
13 back calculate what Mr. Adams' fentanyl level was
14 while he was alive?
15     A.  I cannot give a specific number.
16     Q.  Do you believe anyone can do that?
17     A.  I don't believe anyone can give a
18 specific number.
19     Q.  Do you have an understanding as to what
20 the parameters of postmortem redistribution are
21 with fentanyl, that is, what I mean by that is, how
22 much or how little can postmortem redistribution
23 effect the fentanyl level?
24     A.  I have seen written documentation

### Page 6

1  ranging from 1.2, 1.6, around 2.6, in that
2  ballpark, and those are ballpark numbers.
3      Q.  I think the 2.6 is quoted in the
4  8th edition of Baselt?
5      A.  Yes.
6      Q.  And the 1.2 and 1.6 come out of some
7  Anderson and Muto work?
8      A.  Anderson work, and I believe we are both
9  aware of an affidavit that he produced in a
10 particular case, yes.
11     Q.  But if you look at the current version
12 of Baselt -- I know you are a medical toxicologist,
13 not a forensic toxicologist, correct?
14     A.  Correct.
15     Q.  Do you still rely on the Baselt text for
16 data type information?
17     A.  "Rely" means that I go to it to make a
18 diagnosis, and I don't do that. I use -- I believe
19 it is a guide, a fairly reliable guide.
20     Q.  And Baselt makes reference to, it is
21 another study, that finds postmortem redistribution
22 could occur in a ratio of up to 2.6, I believe?
23     A.  2.6, I believe it was, yes, in the
24 8th edition. He doesn't have it in the previous

### Page 7

1  edition.
2      Q.  In the previous edition he quotes the
3  Anderson and Muto study in 2000?
4      A.  1.6.
5      Q.  As an average?
6      A.  Yes, I agree.
7      Q.  The 6th edition also refers to the range
8  that Anderson and Muto found that, I believe, was
9  .07 to 4.6?
10     A.  Without having it in front of me, that
11 sounds about right.
12         For the record, I have given you both
13 editions, actually.
14     Q.  You have given me both editions. Was
15 there a 7th in between?
16     A.  There is a 7th. I did not include it.
17 I did not feel there were substantive changes
18 between 6 and 7.
19     Q.  So if postmortem redistribution has a
20 role in the case, and we will use the number here,
21 if Mr. Adams had had a living level of 3.5, if
22 postmortem redistribution applied at a 0.7, it
23 would actually reduce his postmortem findings?
24     A.  I don't understand that question.

### Page 8

1      Q.  Let's look at Baselt's 6th edition, the
2  Anderson and Muto data.
3          What is the range of postmortem
4  redistribution that they report?
5      A.  He says what you articulated earlier,
6  range of .7 to 4.6, so an average of 1.6.
7      Q.  Let me backtrack. Do you have an
8  opinion as to what Mr. Adams' fentanyl level was at
9  the time just before his death?
10     A.  I do not have a specific number. As I
11 articulated, I don't know how anyone could give a
12 specific number.
13     Q.  If we just say that level was 3.5 --
14     A.  Fine.
15     Q.  If we look at the postmortem data in
16 Baselt and apply the average, which would be 1.6,
17 that would, theoretically, increase the postmortem
18 findings by a factor of 1.6?
19     A.  By 60 percent, that's one
20 interpretation.
21     Q.  What other interpretation would there
22 be?
23     A.  The other interpretation is that --
24 well, depends where the blood was drawn. Your



Toll Free: 888.486.4044
Telephone: 954.622.1092

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

Exhibit 24

### 9

1  question did not articulate that, so one would have
2  to take that into account.
3      Q.   Finish the answer.
4      A.   And it depends if we are talking whole
5  blood versus serum. This appears to be whole
6  blood. It appears the levels here were whole
7  blood, in this sense, but I believe that's one
8  interpretation that could be made, yes.
9      Q.   Basically, we just, basically, take the
10 3.5 times the 1.6, and get the answer?
11     A.   As a general range, that might be
12 appropriate.
13     Q.   And to make it mathematically so that I
14 can do it, if you use the ratio of 2, it would
15 simply double the amount of fentanyl found?
16     A.   Yes.
17     Q.   Instead of 3.5, it would be 7?
18     A.   7, I agree.
19     Q.   Why do you believe that postmortem
20 redistribution did not -- I take it, you believe
21 did not significantly effect the levels in this
22 case?
23     A.   I am not saying anything about the
24 levels. In fact, I just articulated that I can't

### 10

1  give a specific number. I don't believe it effects
2  the interpretation.
3      Q.   So you have no opinion one way or the
4  other whether postmortem redistribution effected
5  the findings on autopsy of Mr. Adams?
6      A.   As far as the interpretation, that's
7  correct. As far as the interpretation of this
8  entire case, that's correct. I don't believe
9  postmortem redistribution will effect the
10 interpretation, the clinical interpretation.
11     Q.   It may have occurred, but it doesn't
12 effect the clinical interpretation?
13     A.   That's correct. Very well may have
14 occurred.
15     Q.   And you don't have an opinion as to the
16 range of which it might have occurred in this case?
17     A.   I can't articulate as far as -- well,
18 your question said "range." You mean range of
19 fentanyl levels, or range of postmortem
20 redistribution?
21     Q.   Range of postmortem redistribution.
22     A.   I articulated earlier that the previous
23 studies, I am not quarreling with those numbers, in
24 this sense, but beyond that, I can't say.

### 11

1      Q.   All right. Why do you hold the opinion
2  in your report that the 12.2 level would not be
3  expected to occur from a 75-microgram patch?
4      A.   Because in all my readings, experience
5  and evaluation of this, I would not expect a level
6  of 12.2 from a patch.
7          Actually, in Baselt's books, he has
8  quotes of what antemortem expectations would be, in
9  this sense, and so I would not expect a level like
10 this either antemortem or postmortem.
11     Q.   You would not expect him to have a
12 12.2 antemortem level from the 75-microgram patch?
13     A.   I agree.
14     Q.   Do you have understanding of how much
15 the amount of fentanyl in a person's body can vary
16 when they use a properly functioning 75-microgram
17 patch, without abusing it, using it exactly as you
18 are supposed to?
19     A.   Well, the standard deviation it lists
20 here is about .6, .7, in that ballpark, nanograms
21 per cc.
22     Q.   Have you seen any other studies relating
23 to how much people have in their blood when they
24 have been using a 75-microgram patch?

### 12

1      A.   Yes, I don't recall them as I sit here,
2  but I am sure I have seen other studies. And that
3  would probably be somewhat consistent with other
4  studies I have seen.
5      Q.   So you would expect in a living level it
6  to be within one or two standard deviations of
7  the 1.7?
8      A.   I agree.
9      Q.   It gives us a range of somewhere less
10 than 1 all the way up to 3?
11     A.   I agree. I absolutely agree.
12     Q.   Those would be living levels?
13     A.   Yes.
14     Q.   Postmortem redistribution doesn't occur
15 in the living, right?
16     A.   No, I would agree, by definition.
17     Q.   When a person dies, however, the drug
18 redistributes, as the term states, correct?
19     A.   That's a possibility. I am not going to
20 say that that's an actuality, happens 100 percent
21 of the time, but that is a possibility.
22     Q.   Why is it that you would not expect a
23 postmortem 12.2 to occur in a patient who was using
24 a 75-microgram patch?



Toll Free: 888.486.4044
Telephone: 954.622.1092

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

Exhibit 24

## 13

1  A.  Because I believe that that is so far
2  away from the normal values. Almost an order of
3  magnitude. Key word being "almost." I am not
4  saying it is an order of magnitude. It is almost
5  an order of magnitude of what would be expected,
6  and so I would not expect that high disparity
7  between postmortem changes in this individual.
8  I am speaking about Mr. Adams.
9      Q.  Where would the line be where you would
10 think that this would be not surprising? If the
11 postmortem level had been 8, would that still be --
12     A.  I still would not expect it.
13     Q.  Even though you acknowledge that
14 postmortem redistribution can effect it with a
15 factor of 1, 2, and according to Anderson and Muto,
16 even 3 or 4?
17     A.  I am saying it is a possibility.
18 I would not expect it. I agree --
19     Q.  You acknowledge it is possible to get
20 these amounts? You just don't think it is likely,
21 is that fair?
22     A.  It is possible to get it. I don't think
23 it is likely. I think it is less likely if it is
24 not heart blood, much, much less likely.

## 14

1      Q.  But you would acknowledge that
2  postmortem redistribution does occur with
3  peripheral blood?
4      A.  I would say it can occur. I don't think
5  it does occur. I think I just said that.
6      Q.  What can and does and would and
7  possible, we have got a lot of those words in
8  there.
9      A.  That's correct. I am telling the truth,
10 the whole truth.
11     Q.  That's all you are asked to do. If it
12 is possible, say it is possible.
13         Let me rephrase that question. Would
14 you believe it is possible for Mr. Adams to have
15 had a therapeutic level of fentanyl while he was
16 alive and end up with a 12.2 postmortem level when
17 his autopsy was done?
18     A.  Heart blood, or as articulated in
19 deposition?
20     Q.  Loose blood taken from the chest area.
21     A.  Heart blood. I did not interpret the
22 depositions as being, actually, cardiac blood, in
23 the sense. That's the question I need to know.
24     Q.  If it was peripheral blood, let's assume

## 15

1  it was peripheral blood, would you believe it was
2  possible that Mr. Adams could have had a
3  therapeutic fentanyl level while he was alive and
4  had a 12.2 at the time of autopsy after death?
5      A.  I cannot say it is impossible. I cannot
6  envision how that possibly can occur.
7      Q.  You are saying it is possible, but you
8  don't think it would occur?
9      A.  No, I said while I am not saying it is
10 impossible, I can't envision how it could occur.
11 I cannot envision that possibility, but I am not
12 saying it is impossible.
13     Q.  If it was heart blood, what would your
14 answer be?
15     A.  I would say it's more possible. I won't
16 say it is impossible, but, again, I would stand by
17 that I would not expect it.
18     Q.  And the basis of this is because you
19 already told me you couldn't predict how much
20 postmortem redistribution would occur?
21     A.  Right, I agree, as far as a specific
22 number.
23     Q.  No one can predict how much it will
24 occur?

## 16

1      A.  I think I testified to that.
2      Q.  And Anderson and Muto found a ratio as
3  high as 4.6 between the peripheral and heart blood,
4  correct?
5      A.  I will go one step further. I am aware
6  of other articles that found even higher, if you go
7  at their extreme of ranges.
8      Q.  Are you familiar with any articles
9  dealing with a living patient whose blood was
10 measured with fentanyl before they died and then
11 was measured after death?
12     A.  As I sit here, I don't recall any.
13 I probably reviewed at some point in my career, but
14 I don't recall, as I sit here.
15     Q.  Have you ever seen a case report from
16 the Journal of Forensic Sciences, January 2008,
17 lead author is Karen Woodall, as relates to the
18 oral abuse of fentanyl patches.
19     A.  I don't recall.
20     Q.  The point of the study relates to oral
21 abuse of the patches, which is not exactly what
22 I am going to ask you about.
23         In the case, a specific case is
24 described, a 42-year-old female, who was found


ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044
Telephone: 954.622.1092

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

Exhibit 24

### 17

1  nonresponsive. Emergency services were called and
2  she was taken to the emergency room department at
3  which time blood was drawn.
4    A.  Okay.
5    Q.  Thereafter, she expired, and an autopsy
6  was done thereafter.
7    A.  Okay. Great.
8    Q.  Unusual circumstance, correct, because
9  most people don't measure living fentanyl levels?
10   A.  Hypothetically, I agree. I would. If
11 this patient came to see me, I would.
12   Q.  Right. But, routinely, doctors don't
13 measure fentanyl levels?
14   A.  I agree. I couldn't agree more.
15   Q.  If this patient's peripheral -- her
16 blood drawn in the hospital, while still living,
17 revealed a 14-nanogram per milliliter fentanyl
18 level --
19   A.  Okay.
20   Q.  It is a high level, correct?
21   A.  I am not arguing that point.
22   Q.  (Continuing) -- you would expect that
23 her postmortem level would be close to 14?
24   A.  No.

### 18

1    Q.  Why not?
2    A.  Because she hadn't -- in that situation,
3  she probably is not in the distribution phase yet,
4  completed distribution phase.
5       I am assuming -- I have not, or I don't
6  recall the exact case that you are talking about,
7  but oral transdermal, she probably didn't have it
8  in there for three days overall. She probably
9  hadn't reached steady state yet, so that wouldn't
10 apply to this discussion.
11      I am assuming that that's a very
12 hyperacute situation in the sense from what you are
13 describing. And with an oral transdermal patch, as
14 we know, it takes a while for it to be totally
15 distributed, so I would expect that not to apply.
16 But, go ahead.
17   Q.  You mean her level would continue to
18 rise, anyway, for reasons other than postmortem
19 redistribution?
20   A.  No, I saying the postmortem level may
21 not reflect the antemortem level.
22   Q.  Postmortem level never reflects the
23 antemortem level, does it?
24   A.  No, it can. I said postmortem

### 19

1  redistribution can occur. I said it doesn't occur
2  100 percent of the time, in this sense, but it is
3  more likely to reflect it if it is in the
4  post-distribution phase, if the drug has already
5  distributed, had time to distribute throughout, not
6  while it is being absorbed.
7    Q.  Does absorption stop at death?
8    A.  Systemic absorption, yes. Local
9  absorption, maybe not.
10   Q.  Would it surprise you if this patient
11 had a postmortem level, peripherally, of 28?
12   A.  Wouldn't surprise me.
13   Q.  And a postmortem level central blood,
14 heart blood, of 32?
15   A.  Wouldn't surprise me.
16   Q.  And those ratios, the ratio between the
17 28 and 32 would actually be consistent with
18 Anderson and Muto, would it not?
19   A.  I believe it would be compatible.
20   Q.  About 1.6 between the peripheral and the
21 heart blood?
22   A.  Yes.
23   Q.  But the case would indicate a ratio
24 of 2 in the peripheral blood between the time

### 20

1  before death and after death, it increased by a
2  factor of 2, from 14 to 28?
3    A.  From 14 to 28. But as I said, there are
4  so many other variables with that, that I don't
5  think it applies to a person who hasn't reached
6  steady state.
7    Q.  You don't know whether this lady reached
8  steady state or not?
9    A.  The one you described?
10   Q.  Right.
11   A.  Obviously, no. Let me it put it this
12 way: I suspect she didn't.
13   Q.  If she was abusing the fentanyl patches
14 orally, she wouldn't reach steady state in the six
15 days you would when you used the patch on your
16 skin, correct?
17   A.  I agree.
18   Q.  Buccal absorption is faster than that?
19   A.  That's why it's done that way.
20   Q.  If you go to abuse a fentanyl patch, you
21 are going to suck on it, right?
22   A.  Well, I wouldn't.
23   Q.  If a person is going to abuse the
24 fentanyl, they are going to put it in their mouth



Toll Free: 888.486.4044
Telephone: 954.622.1092

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

Exhibit 24

### 21

1  because the absorption is much faster?
2  A.  I would think so.
3  Q.  Have you done studies to see how long it
4  would take to get steady state from oral abuse of
5  fentanyl patches?
6  A.  I can honestly say I have not.
7  Q.  Are you aware of any other studies that
8  measured the fentanyl level of a living person and
9  then measured it after death in peripheral and
10 central locations?
11 A.  As I said, I don't recall, as I sit
12 here. I probably have seen them, but I don't
13 recall it, as I sit here.
14 Q.  You have testified in other related
15 cases relating to Duragesic patches?
16 A.  That's correct.
17 Q.  During the course of preparing in those
18 cases, you have never seen an article or a case
19 report indicating that being done?
20 A.  I can't recall that, seeing that. I may
21 have seen it, but I can't recall.
22 Q.  Back to your opinions. The autopsy was
23 done by a Dr. Jacobi?
24 A.  That's my understanding.

### 22

1  Q.  It was done in Indiana, correct?
2  A.  That's my understanding.
3  Q.  He made a conclusion as to the cause of
4  death, correct?
5  A.  To a certain extent, yes.
6  Q.  You lost me with the "to a certain
7  extent." Did he make a determination of cause of
8  death?
9  A.  He made a determination. I don't know
10 if it is a conclusion.
11 Q.  Isn't it true that Dr. Jacobi determined
12 the cause of death to be cardiac arrythmia,
13 secondary to coronary artery atherosclerosis?
14 A.  That's what he has down there, yes,
15 along with other things.
16 Q.  He has also that a contributing
17 condition was fentanyl toxicity?
18 A.  That's correct.
19 Q.  Do you disagree with his finding that
20 death was caused by cardiac arrhythmia, secondary
21 to coronary artery atherosclerosis?
22 A.  I have no opinion.
23 Q.  Do you believe that fentanyl in toxic
24 levels causes coronary artery atherosclerosis?

### 23

1  A.  No.
2  Q.  Does fentanyl in toxic levels cause
3  cardiac arrythmia?
4  A.  Indirectly, very, very, very, very,
5  very indirectly, yes.
6  Q.  Very indirectly, in such that it would
7  cause respiratory suppression that would ultimately
8  cause other damage, which would cause damage and
9  then ultimately cause cardiac arrythmia?
10 A.  Yes, I couldn't have said it better.
11 Q.  You are not going to come to court and
12 disagree with Dr. Jacobi's findings?
13 A.  I am not going to disagree with what he
14 has written here. I am not -- I am not saying
15 I don't disagree. I am saying I have no opinion.
16 Q.  Is it because it is outside your area of
17 expertise?
18 A.  To a certain extent, but not to a
19 complete extent. I wasn't asked to really comment
20 on his comments, so I was not asked to directly
21 comment on that aspect.
22 Q.  You weren't asked to determine the cause
23 of death of the patient?
24 A.  I was not asked to determine the cardiac

### 24

1  aspect to it.
2  Q.  So as I come out of this deposition, the
3  only thing I have got to make sure I absolutely
4  come out of here is knowing what basic opinions you
5  are going to give at trial.
6      Right now I understand you are going to
7  say that a 12.2 postmortem level you would not
8  expect to find from use of one 75-microgram patch?
9  A.  Used appropriately.
10 Q.  Used appropriately?
11 A.  That's correct.
12 Q.  You are assuming it was used
13 appropriately?
14 A.  That's correct.
15 Q.  Is there anything else you are going to
16 say?
17 A.  Well, what's in my letter, pretty much
18 what's confined in my letter.
19 Q.  You do put in there that these narcotic
20 levels -- I don't know, are you referring to -- you
21 said, "particularly the fentanyl are significant
22 contributing factors to Mr. Adams' death."
23 A.  I believe it is.
24 Q.  It would not have caused the cardiac


ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044
Telephone: 954.622.1092

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

Exhibit 24

### Page 25

1  arrhythmia --
2     A.  Just for the record, I spelled that
3  wrong, but --
4     Q.  So how was the fentanyl, in your mind,
5  in your opinion, a significant contributing factor?
6     A.  Well, basically, I believe that there
7  was some degree of narcosis as described by his
8  wife's deposition, Page 66; that had I seen him at
9  that time that she describes him, on the early
10 morning of April 29th, I believe, in that sense,
11 I would have treated him for fentanyl toxicity.
12    Q.  Based on what did she say?
13    A.  That he mumbled something, I think those
14 were the words. It sounds like, and I am
15 paraphrasing, that he was barely arousable, or
16 something like that, in a sense.
17        That doesn't sound like a heart attack
18 to me. That sounds like fentanyl toxicity. And
19 had I seen him at that particular time, whether
20 I had these levels back or not instantaneously,
21 I would treat him for fentanyl toxicity.
22    Q.  Based just on the fact that he mumbled?
23    A.  Based on the fact that he was barely
24 responsive. That would be compatible with what

### Page 26

1  I have down here, central nervous system
2  depression.
3     Q.  Is there anything else in that
4  deposition other than the fact that he mumbled?
5  And you are interpreting that as barely responsive?
6     A.  I think that's compatible with barely
7  responsive. I am saying this is compatible with
8  central nervous system depression. I am not going
9  to quantitate it.
10    Q.  Sleeping is compatible with central
11 nervous system depression, correct?
12    A.  Not pathologic, no.
13    Q.  Would it not cause him to sleep,
14 initially, if he was at toxic levels of opiates?
15    A.  That's a pathological reaction. Yes, it
16 would cause somnolence, absolutely, but that's a
17 pathological reaction. Sleep is not. That's
18 physiological.
19    Q.  Everyone that sleeps doesn't need to be
20 treated for fentanyl toxicity?
21    A.  I couldn't agree more, but that's
22 physiologic, not pathological.
23    Q.  So you believe that even if Dr. Jacobi
24 wasn't wrong with the primary cause of death, you

### Page 27

1  believe that fentanyl was the contributing factor?
2     A.  Absolutely.
3     Q.  You state in your report, "Fentanyl,
4  even at elevated doses, rarely exhibits any direct
5  cardiac arrhythmia effect"?
6     A.  I testified to that earlier, that's
7  correct. Indirectly, yes.
8     Q.  And you also indicate, "There does not
9  appear to have been any significant cardiac-related
10 symptoms exhibited by Mr. Adams prior to his
11 death."
12    A.  Yes, that's correct.
13    Q.  Okay. How much medical care did
14 Mr. Adams receive prior to his death? Had he been
15 to a doctor his whole life?
16    A.  She said rarely. I guess he had an
17 appendectomy 29 years before, in the sense, if I am
18 not mistaken. There is multiple visits from the
19 January -- from the time the cow hit him, so to
20 speak, to April 29th, there are multiple, multiple
21 visits.
22        But prior to, I believe, January
23 something '05, I think he rarely visited a
24 physician was the testimony.

### Page 28

1     Q.  Did Mr. Adams have back pain and chest
2  pain?
3     A.  He had back pain.
4     Q.  Can chest pain be radiated to the back?
5     A.  Rarely, yes.
6     Q.  You are an emergency room physician,
7  correct?
8     A.  You bet.
9     Q.  If you see a patient with back pain, is
10 it within your differential diagnosis that it might
11 be a coronary or cardiac origin for that pain?
12    A.  Very rarely, yes. Very rarely, yes.
13    Q.  Is it rarely in your differential
14 diagnosis, or is it always in your differential
15 because it rarely occurs?
16    A.  It is rarely in my differential
17 diagnosis and it rarely occurs, both.
18    Q.  You feel like you would have to rule it
19 out in an emergency room setting if someone had
20 back pain?
21    A.  No. No, I don't get EKGs on everyone
22 that comes here with back pain, or on every patient
23 I see. That's not the standard of care, to my
24 knowledge.



Toll Free: 888.486.4044
Telephone: 954.622.1092

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

Exhibit 24

### 29

1  Q. Did Mr. Adams receive an EKG in weeks
2  before --
3  A. I saw a rhythm strip. I did not see a
4  12-lead EKG. Actually, I saw a rhythm strip within
5  a few days of his death.
6  Q. Do you know what the cause of Mr. Adams'
7  back pain was?
8  A. Musculoskeletal trauma.
9  Q. Did you read Dr. Grimm's deposition?
10 A. Yes.
11 Q. The orthopedic surgeon that was treating
12 him?
13 A. Yes.
14 Q. Is it true that Dr. Grimm indicated he
15 could find no physiologic cause for the degree of
16 pain that Mr. Adams was experiencing?
17 A. I don't know if he actually said that,
18 but I got -- that was the partial understanding.
19 I did not investigate that aspect.
20 Q. Mr. Adams had what was described as a
21 fatty liver?
22 A. I would agree, it appears.
23 Q. You didn't see his liver, though, right?
24 A. No. I am just answering your question.

### 30

1  Q. He had a fatty liver, correct?
2  A. It appears that may be the case.
3  Q. Can liver abnormalities or liver
4  dysfunction effect the metabolism of drugs?
5  A. Theoretically, yes.
6  Q. If your liver doesn't work, as well, it
7  takes longer to metabolize drugs out of the system,
8  correct?
9  A. Theoretically, yes.
10 Q. And the amount of drug in your system
11 depends on what goes in and what comes out,
12 correct?
13 A. Theoretically, yes.
14 Q. So if it comes in at the same level and
15 it goes out slower, your levels are going to get
16 higher?
17 A. That's a possibility, hypothetically.
18 Q. Well, I mean, with my hypothetical, it
19 is more than a hypothetical. If you put the same
20 amount of drug into the body, and the body isn't
21 able to metabolize it as quickly as you would
22 expect, the level would be higher than you would
23 expect, wouldn't it?
24 A. That's hypothetical, because it depends

### 31

1  upon the severity of the liver disease. It depends
2  upon the nature of the liver disease, other liver
3  functions tests being abnormal, things like that.
4  There are so many other variables with that.
5  That's why I am saying, hypothetically, I agree.
6  Reality-wise, in most cases, it doesn't
7  really make much of a difference.
8  Q. Do drug levels vary from person to
9  person?
10 A. Yes, that's why everyone talks about
11 ranges.
12 Q. Why do drug levels vary from person to
13 person?
14 A. There may be some differing degrees of
15 variability of liver metabolism, of renal
16 excretion, of biodistribution or distribution of
17 the drug, so there may be some variables for that,
18 but it is a relatively small amount of variability.
19 Q. What would you think the variability
20 would be with most opiates?
21 A. We talked about fentanyl being the
22 standard deviation, .6. We are talking .6
23 nanograms per cc. That's pretty small in the
24 overall scheme of things, and so I think most other

### 32

1  opiates probably fall into that degree of range.
2  But there is different variability when one takes
3  into account tolerance and things like that.
4  Q. Are you familiar with a study done by
5  Merkin Dontay about switching patients from
6  fentanyl to methadone?
7  A. Fentanyl to methadone?
8  Q. I think it was methadone. Yes, opioid
9  plasma concentrations during a switch from
10 transdermal fentanyl to methadone.
11 A. Not familiar with that, as I sit here.
12 Q. I am not particularly interested in the
13 switch to methadone, but he measured the
14 fentanyl -- another case where he measured fentanyl
15 levels.
16 A. Sure.
17 Q. And you are not familiar with it,
18 correct?
19 A. I am not familiar with that article, as
20 I sit here. I am not saying I haven't read it, but
21 I am not familiar with it.
22 Q. I take it, you believe that postmortem
23 redistribution did not play a significant role
24 because you believe it was peripheral blood that



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044
Telephone: 954.622.1092

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

Exhibit 24

### 33

1  was drawn?
2  A. That's part of it, but the very small
3  part of it. Actually, the sentence says, "did not
4  play a significant role in the clinical
5  interpretation."
6  Q. Whose clinical interpretation?
7  A. Mine, and I believe most other
8  reasonable physicians. And when I talk about
9  physicians, I am talking about medical physicians
10 or DO's.
11 Q. I think I understand that. Go back to
12 the stuff that we usually cover at the beginning of
13 the deposition.
14 A. Sure, whatever you want.
15 Q. I am going to mark as Exhibit No. 2, a
16 list of the depositions you have given.
17 A. Yes, since 2000.
18     (WHEREUPON, said document was marked
19     Leikin Deposition Exhibit No. 2, for
20     identification, as of 2/13/09.)
21 BY MR. AUCIELLO:
22 Q. Is this an up-to-date list?
23 A. I think I have done a couple of other
24 depositions in January and February. May have done

### 34

1  one other this month, but I don't remember, so
2  there may be one or two missing.
3  Q. It is up to a month or so ago?
4  A. Yes.
5  Q. What percent of your professional time
6  do you spend doing medicolegal consulting?
7  A. About 20 percent, roughly.
8  Q. And is there an area of specialty that
9  you have in your consulting business?
10 A. Toxicology.
11 Q. Forensic toxicology or medical
12 toxicology?
13 A. To me, the same thing.
14 Q. Is there a difference between forensic
15 toxicology and medical toxicology?
16 A. I suppose to a lot of people there is.
17 Q. To you?
18 A. To me, medical toxicology means the
19 active care and treatment of patients that are
20 overdosed or have adverse side effects or any
21 toxicological issue, in the sense.
22     Forensic means, kind of, a backdating,
23 so to speak, to try to recreate what happened.
24 I have heard definition of forensic being

### 35

1  defensible in court and those aspects. And when
2  one is treating a patient, medically, there are
3  some forensic aspects to it.
4  Q. But a forensic toxicologist works in a
5  lab and evaluates samples of blood taken from
6  people living or deceased, and draws conclusions
7  from those tests they do to those samples?
8  A. I agree with half of that.
9  Q. What part don't you agree with?
10 A. I agree with the part about a laboratory
11 toxicologist or laboratory analyst, as far as
12 analytical toxicologists. I agree that I don't do
13 that part. I don't sit in a lab and analyze that.
14     But I am called upon to interpret it.
15 And I believe to interpret such levels, one has to
16 do it in a clinical context, and one can only do it
17 if one sees patients.
18 Q. When you interpret it as a medical
19 toxicologist or emergency room physician, you are
20 interpreting it on living patients, right?
21 A. Most of the time, yes.
22 Q. Here at this hospital, when you are
23 practicing, they don't call you to ask you to look
24 at the fentanyl level of a dead person?

### 36

1  A. I can honestly say that that hasn't
2  happened, but I have been called about,
3  retrospectively, to look at people who have died
4  within the hospital or other hospital settings and
5  try to recreate that. That happens about few times
6  a year.
7  Q. You don't, generally, go to a medical
8  toxicologist to determine cause of death.
9  A. Why not? Why wouldn't one?
10 Q. Don't medical examiners or coroners
11 usually do that?
12 A. They, usually -- you are right, they
13 usually do that, but there have been occasions they
14 have called me to help them out.
15     I am not saying it is very frequent, but
16 there have been occasions.
17 Q. In your medicolegal work, are most of
18 the cases civil cases or criminal cases?
19 A. Virtually all civil.
20 Q. Are they categorized as medical
21 malpractice cases?
22 A. Not too many are. Probably less than
23 20 percent.
24 Q. What are most of them?



Toll Free: 888.486.4044
Telephone: 954.622.1092

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

Exhibit 24

37

1  A.  Most of them are workers injuries,
2  impairment issues, that sort of thing.
3  Q.  Do you use a service for the billing on
4  these cases?
5  A.  Yes.
6  Q.  What is that service called?
7  A.  I believe for this one it is INSPE.
8  Q.  What does INSPE do?
9  A.  They do some, like, secretarial work.
10 They make some arrangements.  They do the billing.
11 They do the collecting.
12 Q.  Now, does INSPE only work for you, or do
13 they work for many people?
14 A.  I hope they work for many people, not
15 just for me.
16 Q.  Is it an expert referral service?
17 A.  I believe that's one of the things they
18 do.
19 Q.  Do they advertise?
20 A.  Maybe they do.  I don't know.
21 Q.  If an attorney is looking for an expert
22 on a particular subject matter, they can call INSPE
23 and be referred to someone in that area?
24 A.  I believe so.

38

1  Q.  And then when you work, I take it,
2  people pay INSPE and then INSPE pays you?
3  A.  Yes.
4  Q.  Do they get a percentage?
5  A.  I believe so, yes.
6  Q.  Do you know what that percentage is?
7  A.  About 20 percent or so.
8  Q.  Did this case come to you through INSPE?
9  A.  I know INSPE is involved.  I don't know
10 if Mr. Carlson called me directly or called INSPE
11 and INSPE sent it to me.
12 Q.  There is just a document here.  We will
13 mark this as Exhibit 3.
14 A.  That's it, so they probably -- by this,
15 it is probably that Mr. Carlson called INSPE first.
16       (WHEREUPON, said document was marked
17       Leikin Deposition Exhibit No. 3, for
18       identification, as of 2/13/09.)
19 BY MR. AUCIELLO:
20 Q.  You said that's one.  Are there other
21 services similar that you work there through?
22 A.  Yes, Expert Resources in Peoria Heights,
23 Illinois, and TASA, somewhere in Pennsylvania.
24 Q.  TASA, I have heard of.

39

1  A.  Yes.
2  Q.  You are listed with TASA?
3  A.  I believe so.
4  Q.  If lawyers call TASA and need a medical
5  toxicologist, it could be referred to you?
6  A.  Could be, yes.
7  Q.  Do they also do the billing and keep a
8  percentage?
9  A.  Yes, same with Expert Resources.
10 MR. AUCIELLO:  Next, Exhibit 4, the CV,
11 I believe, you provided us this morning.
12 THE WITNESS:  Up to date.
13      (WHEREUPON, said document was marked
14      Leikin Deposition Exhibit No. 4, for
15      identification, as of 2/13/09.)
16 BY MR. AUCIELLO:
17 Q.  I believe you said that's an up-to-date
18 CV?
19 A.  Yes.
20 Q.  This is also in the stack.  I am not
21 going to mark it until I find out what it is.
22      What is that?
23 A.  Actually, it is all together.  It is, as
24 per your request, you asked me, as per one of your

40

1  writers, if it is called a writer, something like
2  that, you asked for materials that were in my file,
3  or that I had reviewed, or something along those
4  lines, so this is as per your request.
5  Q.  So these are pieces of literature that
6  you reviewed as a part of your review in this case?
7  A.  Yes.
8  Q.  Is this everything you reviewed?
9  MR. CARLSON:  Stuff underneath it.
10 BY THE WITNESS:
11 A.  Yeah, there are things underneath.
12 I saw Dr. Karch's book, but I don't know if I
13 independently reviewed it for this case.
14      There was a Journal Analytical
15 Toxicology article late last year that I know
16 I reviewed, but I don't think I specifically
17 reviewed it for this case.
18 MR. CARLSON:  Is that the October '08?
19 BY THE WITNESS:
20 A.  Yes.
21 BY MR. AUCIELLO:
22 Q.  The Hennepin County article?
23 A.  I did review the whole article for the
24 record.  That's the abstract of it.



Toll Free: 888.486.4044
Telephone: 954.622.1092

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

Exhibit 24

## 41

1  Q. What conclusions or facts did you draw
2  from that article that are relevant to this case?
3  A. None. It, just, more or less,
4  I believe, is compatible with what I am saying.
5  Q. Do you believe that fentanyl readings,
6  postmortem fentanyl readings, would be more
7  accurate if they were taken from the liver?
8  A. That was one of their conclusions. And,
9  in fact, I will go one step further. If you
10 remember, or as you have in front of you, they gave
11 specific numbers, in this sense.
12      I think it is an overstatement.
13 I think hepatic levels may be able to assist, but
14 I don't think one can make a firm diagnosis just
15 with that in the usual circumstances.
16 Q. Were femoral fentanyl concentrations
17 higher than heart concentrations in that study?
18 A. I remember there was a wide variation,
19 in that sense, so there may very well may have been
20 some. I also remember there were only about nine
21 or twelve patients.
22 Q. Nine.
23 A. Nine, okay. So in that study, there
24 were fewer patients than the other studies that we

## 42

1  had articulated that were covered in Baselt's book,
2  in this sense, so I recall that aspect.
3  Q. Are you familiar with any general
4  literature among toxicologists, whether they be
5  forensic or medical, that drawing conclusions from
6  postmortem drug levels is very difficult?
7  A. It can be, yes. It can be. I agree.
8  Q. And that it would be good to find
9  alternate ways to measure drugs in postmortem
10 settings that would more accurately reflect what
11 the drug level was in life?
12 A. I will go one step further. Ideally,
13 one would like to have two sites determination,
14 ideally. Virtually, all the cases I have been
15 involved with, that's never happened.
16      When I say "two sites," I mean two sites
17 for blood specimen.
18 Q. One peripheral, one sentinel?
19 A. Yes. Taking it one step further,
20 Dr. Karch, I think, says that, too.
21 Q. That's who I was thinking about. You
22 have Dr. Karch's brand new book?
23 A. Not only do I have his brand new book,
24 but as you can see from my -- I hope it is in my

## 43

1  CV, I just reviewed it for Journal of Clinical
2  Toxicology.
3  Q. Did he get a favorable review?
4  A. Kind of.
5  Q. You agree with everything that's in it?
6  A. I don't agree with everything that's
7  in -- no, I don't agree with everything. That's
8  not the point.
9       I think his other books are more
10 complete, let me put it this way. This is too
11 short, or too brief, for this subject.
12 Q. Are you familiar with his chapter on
13 fentanyl?
14 A. Maybe we are not talking about the same
15 book.
16 Q. Brand new book. I have seen it this
17 morning.
18 A. I will show you what book I am talking
19 about. I am talking about a book that fentanyl is
20 only mentioned once on Page 143.
21 Q. This wasn't Page 143.
22 A. We are talking about two different
23 books.
24 Q. Who is Dr. Karch?

## 44

1  A. A physician that, I believe, is a
2  pathologist.
3  Q. He has published a lot on drug levels
4  and toxicology?
5  A. Through CRC Press, primarily, yes.
6  Q. A publisher? I don't know who that is.
7  A. That's a publisher, yes. He has several
8  books through CRC Press.
9  Q. Is he generally respected in the field?
10 A. What field do you mean?
11 Q. In your field.
12 A. Well, my field, I don't think he is as
13 well-known as a medical toxicologist.
14 Q. Is he well-known among forensic
15 toxicologists?
16 A. Maybe so. I can't speak to that.
17 Probably so. But in medical toxicology, I don't
18 think he is as well-known.
19 Q. Do you have an opinion as to whether the
20 fentanyl, in a transdermal patch, would continue to
21 infuse after death?
22 A. Locally, that's a possibility.
23 Q. It would infuse locally into the blood
24 that was local, correct?



Exhibit 24

Toll Free: 888.486.4044
Telephone: 954.622.1092

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

### 45

1  A. Passive diffusion local, that's a
2  possibility. I don't think it is a likelihood, but
3  it is a possibility into that area.
4  Q. Of course, blood isn't circulating after
5  death?
6  A. I couldn't agree more.
7  Q. But the blood does get moved around when
8  the body is moved around?
9  A. Hypothetically, I suppose it can.
10 I can't speak as far as -- I can't quantify that.
11 Q. I don't know if anybody can.
12 A. Right. I suppose, hypothetically, that
13 could occur.
14 Q. You also provided me two copies of your
15 article "Postmortem Toxicology."
16 A. Yes, I meant to provide one, but I will
17 give you both.
18 Q. Have you reviewed the reports of
19 Dr. Factor and Dr. Kaplan?
20 A. Yes.
21 Q. Dr. Factor is a pathologist. Do you
22 have any disagreement or opinions relating to his
23 conclusions?
24 A. I don't have any opinion.

### 46

1  Q. Okay. It is outside your area of
2  expertise?
3  A. I don't think it is completely outside
4  my area of expertise, but, again, I was not really
5  asked to look into the cardiac aspects.
6  Q. Dr. Kaplan, have you heard of
7  Dr. Kaplan?
8  A. Yes.
9  Q. Is he forensic toxicologist?
10 A. That's my understanding.
11 Q. You have disagreement with his
12 conclusions?
13 A. Yes.
14 Q. Which of his conclusions do you disagree
15 with?
16 A. Okay. You are focusing on the last
17 page?
18 Q. The three conclusions.
19 A. Okay. No. 1, I disagree. And I think
20 I have stated that earlier, in this sense, overall.
21      No. 2, I suppose, the first sentence is
22 hyper-legalistically correct, the principal cause
23 of death, but he did -- it is listed on the death
24 certificate, overall. And so, No. 2, to me,

### 47

1  implies that the coroner/pathologist did not
2  determine that fentanyl was a contributing cause of
3  death, or had anything to do with the death. And I
4  believe it being on the death certificate implies
5  that it does. But the way Dr. Kaplan states No. 2,
6  that could be misleading.
7       But, most importantly, and I don't know
8  if he is saying Conclusions 1, 2 and 3 are in
9  priority. I don't know if there is priority. It
10 doesn't talk anything clinical. It doesn't talk
11 about the clinical circumstances.
12      One has to look at the clinical
13 circumstances, which I articulated earlier, in this
14 sense. And then he goes on to say that other drugs
15 he was taking contributed to cardiac events causing
16 his death.
17      Well, they were in a much lower, either,
18 therapeutic or subtherapeutic range, in this sense,
19 unlike the fentanyl concentration. And there may
20 be postmortem redistribution issues with those, in
21 this way. So even to include Point No. 3,
22 I believe, is misleading.
23 Q. You would disagree with it?
24 A. Yes, I disagree with it in the context.

### 48

1  Q. So you disagree with all his statements
2  of opinion in here? The statement of fact of what
3  the corner and pathologist determined is accurate,
4  but you disagree with all of his opinions?
5  A. Yes, respectfully disagree.
6  Q. Sure. Did you review Dr. Grimm's
7  testimony?
8  A. Yes, it is on my letter, yes. I also
9  reviewed, for the record, Dr. Evans' testimony.
10 Q. Okay. Right. Do you have any
11 disagreement with Dr. Evans?
12 A. No.
13 Q. Dr. Grimm prescribed an initial dose of
14 75 micrograms per hour?
15 A. That's my understanding.
16 Q. Does that exceed what is recommended in
17 the package insert for this patient?
18 A. It might.
19 Q. If he was on 60 milligrams of Avinza,
20 and using the conversion table, that would
21 translate to a 25-microgram patch?
22 A. That's why I said "it might."
23 Q. Would Mr. Adams, being on a higher
24 initial dose than recommended by the manufacturer,



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044
Telephone: 954.622.1092

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

Exhibit 24

### 49

1  potentially cause him to have a higher fentanyl
2  level?
3      A.  I have no opinion.
4      Q.  Do you have an opinion as to whether
5  Dr. Grimm's prescribing three times the recommended
6  dose would violate any standards of care?
7      A.  I have no opinion, and I don't know that
8  he did prescribe three times.
9      Q.  Are you familiar with the package
10 insert?
11     A.  It is in my book, yes. The answer is
12 yes.
13     Q.  And there is a conversion table,
14 correct?
15     A.  There is absolutely a conversion table,
16 but I also note that Mr. Adams was on other opioid
17 products at various times, including OxyContin and
18 Ultram.
19     Q.  Which would indicate some preexisting
20 tolerance for opioids?
21     A.  I agree with the exact word you said,
22 "indicate."
23     Q.  So he wasn't an opiate-naive person when
24 he was prescribed a Duragesic patch?

### 50

1      A.  I agree with that.
2      Q.  Would you agree that he -- and you may
3  not have an opinion at all.
4      A.  Okay. Sure.
5      Q.  (Continuing) -- that he had at least a
6  70-percent blockage of his coronary arteries?
7      A.  I have no opinion on that.
8      Q.  An EKG can't necessarily predict a
9  cardiac arrythmia, can it?
10     A.  Arrhythmia?
11     Q.  Arrhythmia.
12     A.  I think an EKG is diagnostic for cardiac
13 arrhythmia while you are having it, yes.
14     Q.  But not before? You could have a normal
15 EKG, and then have a cardiac arrhythmia?
16     A.  That's possible.
17     Q.  When you evaluate people for potential
18 heart attacks or other cardiac issues in the
19 emergency room, just because they have a normal EKG
20 for a point in time doesn't rule it out?
21     A.  I agree. It helps, but I agree it
22 doesn't rule it out.
23     Q.  Have you yourself conducted any studies
24 to determine what the expected fentanyl level would

### 51

1  be in the blood after use of a 75-microgram patch?
2      A.  No, sir.
3      Q.  Have you reviewed any clinical studies
4  or anything beyond the package insert concerning
5  that issue?
6      A.  I've got a lot of articles here, in the
7  sense, so, I guess, the answer would be yes.
8      Q.  What have you reviewed that addressed
9  the expected fentanyl level in the blood after the
10 use of a 75-microgram patch other than the package
11 insert?
12     A.  It is in Baselt's book. I just
13 testified to that.
14     Q.  Where in Baselt's book, the 8th edition?
15     A.  8th edition, I think it is the first
16 paragraph under Blood Concentration.
17     Q.  This is the 1.1 to 2.6 range for the 75?
18     A.  That is compatible with what my
19 understanding is.
20         That's also, for the record, in
21 Poisondex. That's the database which I have
22 supplied.
23     Q.  What's the source of that data, do you
24 know, the source that Baselt got it?

### 52

1      A.  Well, I think it says in there, but as
2  I sit here I don't recall exactly.
3      Q.  I can look it up later.
4      A.  May have gotten it from the package
5  insert, but I cannot articulate it.
6      Q.  What I am looking for is any studies you
7  may have looked at other than the ones that were
8  referenced in the package insert. None come to
9  mind?
10     A.  None come to mind as far as primary
11 studies. As I have said, I have given two or three
12 recitations of databases that articulate it.
13     Q.  What does it say in your database?
14 Is it the same data that you got --
15     A.  Actually, it is a little bit more
16 extensive.
17     Q.  But this comes right out of the package
18 insert, doesn't it?
19     A.  It probably does. I did not get it from
20 the package insert.
21     Q.  Where did you get it from?
22     A.  Poisondex. Actually, DRUGDEX.
23     Q.  You got it from a website?
24     A.  No, it is database.



Exhibit 24

Toll Free: 888.486.4044
Telephone: 954.622.1092

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

### 53

1  Q.  A database?
2  A.  It is not a website.
3  Q.  You don't know where they got it?
4  A.  No, I think they got it from the package
5  insert.
6  Q.  So, my point is to try to find any data
7  you are looking at that doesn't come from a package
8  insert. And if there isn't anything, you could
9  tell me that, and we will move on.
10  A.  As I articulated, I don't know of any
11  others at this time. I probably did, but I noted
12  it in a couple of review articles, review
13  databases.
14  Q.  You also brought a packet of materials
15  that you reviewed relating to Mr. Adams' care?
16  A.  Yes. By the way, for the record, it was
17  also in Anderson's article.
18  Q.  Okay.
19  A.  Just, for the record. Yes, this was
20  supplied by Mr. Carlson.
21  Q.  And it is a booklet with a chronology
22  followed by the death certificate, the autopsy --
23  A.  Medical records.
24  Q.  -- medical records.

### 54

1  A.  I believe there is autopsy records in
2  there, too.
3      MR. AUCIELLO: I am just going to mark the
4  chronology, because you are going to get my
5  chronology when you depose my experts.
6      Thank you, Doctor. I have no further
7  questions.
8      THE WITNESS: Thank you.
9      MR. CARLSON: Reserve.
10      FURTHER DEPONENT SAITH NOT.

### 55

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF ILLINOIS

LINDA ADAMS, etc.,        )
       Plaintiffs,  )
    vs.             ) No. 2007-CV-0497-DGW
JOHNSON & JOHNSON, et al., )
       Defendants.  )

I hereby certify that I have read the foregoing transcript of my deposition given at the time and place aforesaid, consisting of Pages 1 to 54, inclusive, and I do again subscribe and make oath that the same is a true, correct and complete transcript of my deposition so given as aforesaid, and includes changes, if any, so made by me.

                JERROLD LEIKIN, M.D.

SUBSCRIBED AND SWORN TO
before me this      day
of     , A.D. 2009.
        Notary Public

### 56

STATE OF ILLINOIS  )
                   ) SS:
COUNTY OF C O O K  )

I, JOANNE H. RICHTER, a Notary Public within and for the County of Cook, State of Illinois, and a Certified Shorthand Reporter of said state, do hereby certify:

That previous to the commencement of the examination of the witness, the witness was duly sworn to testify the whole truth concerning the matters herein;

That the foregoing deposition transcript was reported stenographically by me, was thereafter reduced to typewriting under my personal direction and constitutes a true record of the testimony given and the proceedings had;

That the said deposition was taken before me at the time and place specified;

That I am not a relative or employee or attorney or counsel, nor a relative or employee of such attorney or counsel for any of the parties hereto, nor interested directly or indirectly in the outcome of this action.

IN WITNESS WHEREOF, I do hereunto set my hand and affix my seal of office at Chicago, Illinois, this 23rd day of February, 2009.

        Notary Public, Cook County, Illinois.
        Commission expires October 26, 2009.

C.S.R. Certificate No. 84-2082.



Exhibit 24

Toll Free: 888.486.4044
Telephone: 954.622.1092

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

**57**

```
 1              I N D E X
 2   WITNESS                    EXAMINATION
 3   JERROLD LEIKIN, M.D.
 4       By Mr. Auciello              3
 5
 6              E X H I B I T S
 7
 8   NUMBER                     MARKED FOR ID
 9
10   LEIKIN DEPOSITION EXHIBIT
11       No. 1                        4
12       No. 2                       33
13       No. 3                       38
14       No. 4                       39
```

**58**

1  DEPOSITION ERRATA SHEET

     RE:    ESQUIRE DEPOSITION SOLUTIONS
3    File No. 11566
4    Case Caption: LINDA ADAMS, ETC.
5    vs. JOHNSON & JOHNSON, ET AL.
6    Deponent: JERROLD B. LEIKIN, M.D.
7    Deposition Date: FEBRUARY 13, 2009
8    To the Reporter:
9    I have read the entire transcript of my Deposition taken
10   in the captioned matter or the same has been read to me.
11   I request that the following changes be entered upon the
12   record for the reasons indicated. I have signed my name to
13   the Errata Sheet and the appropriate Certificate and
14   authorize you to attach both to the original transcript.
15
16   Page No._____ Line No._____ Change to:_____
17   _____
18   Reason for change:_____
19   Page No._____ Line No._____ Change to:_____
20   _____
21   Reason for change:_____
22   Page No._____ Line No._____ Change to:_____
23   _____
24   Reason for change:_____

**59**

1   Deposition of JERROLD B. LEIKIN, M.D.
2   Page No._____ Line No._____ Change to:_____
3   _____
4   Reason for change:_____
5   Page No._____ Line No._____ Change to:_____
6   _____
7   Reason for change:_____
8   Page No._____ Line No._____ Change to:_____
9   _____
10  Reason for change:_____
11  Page No._____ Line No._____ Change to:_____
12  _____
13  Reason for change:_____
14  Page No._____ Line No._____ Change to:_____
15  _____
16  Reason for change:_____
17  Page No._____ Line No._____ Change to:_____
18  _____
19  Reason for change:_____
20
21
22
23  SIGNATURE:_____ DATE:_____
24           JERROLD B. LEIKIN, M.D.



ESQUIRE
an Alexander Gallo Company

Exhibit 24

Toll Free: 888.486.4044
Telephone: 954.622.1092

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

Exhibit 24